JOSEPH PENNOCK AND NATHAN F. HART, APPELLANTS, *v.* GEORGE S. COE, TRUSTEE OF THE CLEVELAND, ZANESVILLE, AND CINCINNATI RAILROAD COMPANY.

A railroad company authorized to borrow money and issue their bonds, to enable themselves to finish and stock the road, may mortgage as security not only the then-acquired property, but such as may be acquired in future.

Although the maxim is true, that a person cannot grant what he has not got, yet, in this case, a grant can take effect upon the property when it is brought into existence, and belongs to the grantor in fulfilment of an express agreement, founded on a good and valid consideration, when no rule of law is infringed or rights of a third party prejudiced. The mortgage attached to the future acquisitions as described in it, from the time they came into existence, and were placed on the road.

Hence, where second mortgagees and holders of bonds of a second issue brought suit upon those bonds, recovered judgment, issued execution, and levied it upon a part of the rolling stock, which was not in existence when the first mortgage was given, the judgment creditors must be postponed to the claims of the first mortgagees.

In the present case, a reasonable interpretation of the statutes creating the corporation would justify it in making the road where it was made.

A bondholder of a class covered by a mortgage to secure the class of bonds issued in case of insolvency of the obligors cannot, by getting judgment at law, be permitted to sell a portion of the property devoted to the common security, as this would disturb the pro rata distribution among the bondholders, to which they are equitably entitled.

THIS was an appeal from the Circuit Court of the United States for the northern district of Ohio.

The bill was filed in the Circuit Court by Coe, mortgagee of the road of the railroad company in trust, for securing the payment of its bonds, to enjoin the execution of a judgment recovered at law against the company by Pennock and Hart, two of the defendants.

The facts of the case are stated in the opinion of the court.

After the case was ready for a hearing, at September term, 1857, the Circuit Court passed the following decree:

"This cause came on to be heard upon the bill of the complainant, the joint answer of Joseph Pennock and Nathan F. Hart, the separate answer of the Cleveland, Zanesville, and Cincinnati Railroad Company, the replication to said answer, the exhibits and testimony, and the motion of said Pennock and Hart to dissolve the injunction heretofore allowed in this case, and was argued by counsel. On consideration whereof, the court do overrule said motion; and the entire facts in the case being before the court, and the arguments of the counsel upon the motion to dissolve said injunction embracing the entire merits of the case, the court do order, adjudge, and decree, that said injunction be made perpetual, and that the said Pennock and Hart be forever restrained from selling, or causing to be sold, by the marshal, the locomotives, tenders, and cars, mentioned in said bill, to satisfy the judgment recovered by them against said railroad company therein described."

From this decree, Pennock and Hart appealed to this court.

It was argued by *Mr. Stanton* for the appellant, upon which side there was also a brief filed by *Mr. Spalding* and *Mr. Parsons*, and by *Mr. Otis* for the appellee.

The arguments upon the question whether the mortgage was void, on the ground of uncertainty as to the property described or attempted to be described therein, and conveyed to the mortgagee, are omitted from this report, inasmuch as the court did not think it necessary to decide that point. Upon

the other and principal branch of the case, viz: whether the mortgage was good as conveying subsequently-acquired property, the views of the respective counsel were as follows, as also upon the point whether the railroad company were authorized to make the road which they did make.

The counsel for the appellants stated the law which governed the case to be the following:

The laws of Ohio authorizing railroad companies to borrow money and secure the payment of the same, are found in the "act regulating railroad companies," passed February 11, 1848, sec. 13, and in the "act to provide for the creation of incorporated companies in the State of Ohio," passed May 1, 1852, sec. 14.

See Swan's Revised Statutes of Ohio, pages 199 and 203.

To secure the payment of money borrowed, they "may pledge the property and income of such company."

The act to revive and amend an act to incorporate the Cleveland and Pittsburgh Railroad Company, passed March 11th, 1845, which is claimed to be the charter of the Cleveland, Zanesville, and Cincinnati Railroad Company, provides, in section six, that "the said company, by its proper officers, duly authorized by the directors, is hereby authorized and empowered to mortgage, hypothecate, or pledge, all or any part of said railroad, or of any other real or personal property belonging to said company, or of any portion of the tolls and revenues of said company which may thereafter accrue, for the purpose of raising money to construct said railroad, or to pay debts incurred in the construction thereof."

Local Laws of Ohio, vol. 43, page 401.

It is insisted, on the part of the appellants, that so much of the indenture, made between the Akron branch of the Cleveland and Pittsburgh Railroad Company and George S. Coe, trustee, on the first day of April, 1852, as purports to put in pledge or mortgage "future acquisitions," is inoperative and void.

Yelverton v. Yelverton, Croke Elizabeth, 401.

Comyns Digest, Grant D., vol. 4, page 310.

Mogg *v.* Baker, 3 Mees. and Welsb., 195.
Jones *v.* Richardson, 10 Metcalf, 481.
Moody *v.* Wright, 13 Metcalf, 17.
Otis *v.* Sill, 8 Barbour S. C. Rep., 102.
Rose *v.* Bevan, 10 Md., 466.

The railroad company had no authority, as a corporate body, to make a railway from "Hudson to Millersburg," and, as a necessary consequence, had no power to borrow money for that purpose. The charter only authorizes the construction of a railroad from Hudson, in Summit county, to Wooster, in Wayne county, or some other point in the Ohio and Pennsylvania railroad between Massillon and Wooster.

See Ohio Local Laws, vol. 49, page 468.

As the road is located, the southern terminus, according to the charter, would be Orville, in Wayne county, which is a point in the Ohio and Pennsylvania railroad between Massillon and Wooster, distant thirty-eight miles from Hudson.

Money was borrowed to make the road to Millersburg, in Holmes county, which is twenty-three miles south of Orville, where the road should have stopped under the charter.

"Corporate powers are never to be created by implication nor extended by construction."

Penn. Railroad Company *v.* the Canal Commissioners, 21 Penn. State Rep., 9.

Stormfeltz *v.* the Manor Turnpike Co., 13 Penn. State Rep., 555.

East Anglian Railway Co. *v.* Eastern Counties Railway Co., 7 Eng. Law and Eq., 505.

Act regulating Railroad Mortgages in Ohio, Swan's Rev. Statutes, 241.

Coleman *v.* the Eastern Counties Railway Co., 4 Eng. Railway Cases, 382.

Perrine *v.* Chesapeake and Delaware Canal Co., 9 Howard's Rep., 172.

Inhabitants of Springfield *v.* Connecticut River Railroad Co., 4 Cushing, 63.

Logan *v.* Earl Courtown, 13 Beav., 22.

Green et al. *v.* Seymour et al., 3 Sandford's Chan. R., 285.

The Penn. &c. Co. *v.* Dandridge, 8 Gill and Johns., 248.
"Notes given by a corporation in violation of law are void."
    Mr. Justice McLean in Root *v.* Goddard, 3 McLean Rep.,
      **102.**
    McGintry *v.* Reeves, 10 Ala., 137.
    Commonwealth *v.* the Erie and Northeast R. R. Co., 27
      Penn. State Rep., 339.
    Peavey *v.* the Calais R. R. Co., 30 Maine Rep., 498.
A right cannot be claimed by a corporation under ambiguous terms.
    Mr. Justice McLean in Charles River Bridge Case, 11
      Peters, 559.

With respect to that point of the case which related to the power of the company to make the road in question, *Mr. Otis,* counsel for the appellees, cited and commented on the following statutes of Ohio:
    1836, March 14; 1845, March 11.
    1851, February 19; 1850, February 21.
    1846, February 26; 1846, March 2.
    1848, February 18; 1848, February 24.
    1847, February 8; 1849, March 12.
It would occupy too much room to follow him through the examination of them all.

With respect to the other point, his argument was as follows:

That the mortgage to Coe is a lien upon the machinery and cars levied upon, though the same were not in existence at the time said mortgage was executed, and though the same did not become a part of the road, by accession, when placed upon it.

For the purpose of this argument, I am willing to admit it to be the general rule of the common law, that nothing can be mortgaged which is not in existence and does not belong to the mortgagor at the time the mortgage is executed.

This proposition is fully established by the following authorities.

    Winslow *v.* Merchants' Ins. Co., 4 Met., 306.

Jones *v.* Richardson, 10 Met., 481.

Lunn *v.* Thornton, 1 M. G. and S., 379.

Otis *v.* Sill, 8 Barb., 102.

But these very authorities also establish the fact that this rule is founded solely upon a technicality. A mortgage is a sale upon condition; and, as before stated, by the rule of the common law there can be no sale of a thing not in existence, and which is not at the time the property of the seller.

The rule of the civil law is the very reverse of that of the common law in this particular, and is thus stated by Domat:

" Those who bind themselves by any engagement whatsoever may, for the security of their performance of the engagement on their part, appropriate and mortgage, not only the estate they are masters of at the time of contracting, but likewise all the estate which they shall be afterwards seized or possessed of. And this mortgage extends to all the things which they shall afterwards acquire, that are capable of being mortgaged, by what title soever it be that they acquire them, and even to those which are not in being when the obligation is contracted; so that the fruits which shall grow upon the lands will be comprehended in the mortgage of an estate to come."

1 Domat, (Cushing's ed.,) 649, art. 5.

" Although the mortgage be restrained to certain things, yet it will nevertheless extend to all that shall arise or proceed from that thing which is mortgaged, or that shall augment it and make part of it. Thus, the fruits which grow on the lands that are mortgaged are subject to the mortgage while they continue unseparated from the ground. Thus, when a stud of horses, a herd of cattle, or a flock of sheep, is put in pawn into the creditor's hands, the foals, the lambs, and other beasts which they bring forth, and which augment their number, are likewise engaged for the creditor's security. And if the whole herd or flock be entirely changed, the heads which have renewed it are engaged in the same manner as the old stock. Thus, when the bounds of a piece of ground that is mortgaged happen to be enlarged by that which the course of a river may add to it, the mortgage extends to that which has augmented

the ground. Thus, a house that is built on a ground which is mortgaged, is subject likewise to the mortgage. And if, on the contrary, a house be mortgaged, and it perishes by fire, or falls through decay, the mortgage will subsist on the ground where the house stood. Thus, when a debtor mortgages a piece of ground of which he had only the bare property, another enjoying the usufruct of it, when the said right to the usufruct comes to be extinct, the mortgage will comprehend the ground with the fruits."

Ib., 650, art. 7.

There is, therefore, no inherent difficulty in making a mortgage which shall extend to after-acquired property, or property not *in esse.* And courts of equity which are not trammelled by the technical rules of the common law in the administration of justice, both in England and in this country, uphold such mortgages, in pursuance of the rule of the civil law, when necessary to carry into effect the honest and just contracts of parties according to their real intentions.

Fonblanque, B. 1, ch. 4, sec. 2.

Ib., ch. 5, sec. 8.

1 Powell on Mort., 190.

Coote on Mort. Law, Lib. ed., 185.

Noel *v.* Burley, 3 Simons, 103.

Metcalf *v.* Archbishop of York, 1 Myl. and Cr., 553.

Langton *v.* Horton, 1 Hare, 539.

Matter of Howe, 1 Paige, 125, 129.

White *v.* Carpenter, 2 Paige, 217, 266.

Abbot *v.* Gordon, 7 Shepley, 408.

Foreman *v.* Proctor, 9 B. Mon., 124.

Jenke's Adm. *v.* Goffe, 1 R. I. Rep., 511.

Field *v.* the Mayor of New York, 2 Seld., 179, 186.

Winslow *v.* Mitchell, 2 Story, 630.

Story Eq. Jur., secs. 1040, 1040 b, 1055.

On page 644 of the case of Winslow *v.* Mitchell, above cited, Judge Story states the rule to be, "that wherever the parties, by their contract, intended to create a positive lien or charge, either upon real or upon personal property, whether then owned by the assignor or contractor or not, or if personal

property, whether it is then in being or not, it attaches in equity as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto, against the latter, and all persons asserting a claim thereto, under him, either voluntarily or with notice, or in bankruptcy."

And the particular question raised in this case has been determined in the following cases.

Willinck *v.* the Morris Canal Co., 3 Green's Chy., 377.

Pierce *v.* Emery, 32 N. H. Rep., 484.

Seymour *v.* Canandaigua and Niagara Falls R. R. Co., 25 Barb., 286.

Farmers' Loan and Trust Co. *v.* Hendrickson, ib., 484.

Philips & Jordon *v.* Winslow, Trustee, &c., (Kentucky Court of Appeals,) 2 Weekly Law Gazette, 4.

Ludlow *v.* Hurd et al., (Superior Court of Cincinnati,) 6 Am. Law Reg., 493.

I also refer to the opinion of Judge McLEAN, pronounced in the case at bar, in the Circuit Court, reported in 6 Am. Law Reg., 27.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the northern district of Ohio.

The bill was filed in the court below, by Coe, mortgagee of the road of the railroad company, in trust, for securing the payment of its bonds, to enjoin the execution of a judgment recovered at law against the company, by Pennock and Hart, two of the defendants.

The facts of the case are these: The Cleveland, Zanesville, and Cincinnati Railroad Co., created a body politic and corporate by the laws of Ohio, to make a railroad between certain termini in that State, in pursuance of authority conferred by law, issued bonds to the amount of $500,000, payable ten years from date, with interest at the rate of seven per cent., payable semi-annually, on the first day of April and October in each year, and, to secure the payment of the same, executed a mortgage of the railroad and its equipments to the complainant, in trust for the bondholders, the description of which is

in the words following: "All the present and future to be acquired property of the parties of the first part; that is to say, their road, made or to be made, including the right of way, and the land occupied thereby, together with the superstructure and tracks thereon, and all rails and other materials used therein, or procured therefor, with the above-described bonds, or the money obtained therefor, bridges, viaducts, culverts, fences, depots, grounds and buildings thereon, engines, tenders, cars, tools, machinery, materials, contracts, and all other personal property, right thereto, or interest therein, together with the tolls, rents, or income, to be had or levied therefrom, and all franchises, rights, and privileges, of the parties of the first part, in, to, or concerning the same." At the time of the issuing of these bonds, and the execution of the mortgage, the railroad was in the course of construction, but only a small portion of it finished. It was constructed and equipped almost entirely by means of the funds raised from these bonds, together with a second issue to the amount of $700,000. The road cost upwards of $1,500,000. The stock subscribed and paid in, amounted only to some $369,000.

The mortgage securing the payment of the second issue bears date the first of November, 1854, and was made to one George Mygatt, in trust for the bondholders, and the property described in and covered by it is the same as that described in the first mortgage. The road was finished to Millersburg, its present terminus south, in May, 1854, and the whole of the rolling stock was placed on it previous to the date of the second mortgage. This stock was purchased and placed on the road from time to time, as the locomotives and cars were needed in the progress of its construction.

The mortgage to the complainant contained a covenant on the part of the company, that the money borrowed for the construction and equipment of the road should be faithfully applied to that object, and that the work should be carried on with due diligence until the same should be finished.

In case of default in the payment of the principal or interest of the bonds, the trustee was empowered to enter upon and take possession of the road, or, at the election of a moiety

of the bondholders, to sell the same at public auction, and apply the proceeds to the payment of the bonds.

The defendants, Pennock and Hart, being the holders of sixteen of the bonds issued under the second mortgage, recovered a judgment on the same, May, 1856, against the railroad company issued execution, and levied on a portion of the rolling stock of the road, and caused the same to be advertised for sale.

This bill was filed to enjoin the sale, and a decree was rendered perpetually enjoining it in the court below, which is now before us on appeal.

The first two grounds of objection taken to this decree may be considered together. They are: 1, that the mortgage to the trustee of the 1st April, 1852, is void or inoperative, as respects the locomotives and cars which were levied on under the execution of the defendants, inasmuch as they were not in existence at the date of it, but were constructed and placed on the road afterwards, being subsequently-acquired property of the company. And, 2, that the mortgage is void, on the ground of uncertainty as to the property described or attempted to be described therein and conveyed to the mortgagee. The description begins by conveying "all the following present and future acquired property of the said parties of the first part;" and after specifying the road and the several parts of it, together with the rolling stock, there is added, "and all other personal property, right thereto, and interest therein." This clause, probably, from the connection in which it is found, was intended to refer to property appurtenant to the road, and employed in its operation, and which had not been enumerated; and if so, the better opinion, perhaps, is, that it would be bound by the mortgage even as against judgment creditors.

But it is unimportant to express any opinion upon the question, as the property in this case (the locomotives and cars) levied on are articles specifically enumerated; and the only uncertainty existing in respect to them arises out of their non-existence at the date of the mortgage. An uncertainty of this character need not be separately examined, as it will be

resolved by a consideration of the first question, which is, whether or not the after-acquired rolling stock of the company placed upon the road attaches, in equity, to the mortgage, if within the description, from the time it is placed there, so as to protect it against the judgment creditors of the railroad company?

If we are at liberty to determine this question by the terms and clear intent of the agreement of the parties, it will be found a very plain one. The company have agreed with the bondholders, (for the mortgagee represents them,) that if they will advance their money to build the road, and equip it, the road and equipments thus constructed, and as fast as constructed, shall be pledged as a security for the loan. This is the simple contract, when stripped of form and verbiage; and, in order to carry out this intent most' effectually, and with as little hazard as possible to the lender, the company specially stipulate that the money thus borrowed shall be faithfully applied in the construction and equipment of the road. And in further fulfilment of the intent, the company agree, that in case of default in the payment of principal or interest, the bondholders may enter upon and take possession of the road, and run it themselves, by their agents, applying the net proceeds to the payment of the debt.

The bondholders have fulfilled their part of the agreement—they have advanced the money on the faith of the security; the company have also fulfilled theirs—they have made the road and equipped it; it has been partially in operation since January, 1852, and in operation upon the whole line since May, 1854. The road, therefore, as described in the mortgage, from Hudson to Millersburg, and which was in the course of construction at the date of the instrument, has been finished, and the rolling stock, locomotives, tenders, and cars, also described in it, and which were to be afterwards acquired, have been brought into existence, and placed upon it—all in conformity with the agreement of the parties; and the question is, whether there is any rule of law or principle of equity that denies effect to such an agreement.

The main argument urged against it is founded upon the

maxim, that "a person cannot grant a thing which he has not:" *ille non habet, non dat;* and many authorities are referred to at law to prove the proposition, and many more might have been added from cases in equity, for equity no more than law can deny it. The thing itself is an impossibility. It may, at once, therefore, be admitted, whenever a party undertakes, by deed or mortgage, to grant property, real or personal, in presenti, which does not belong to him or has no existence, the deed or mortgage, as the case may be, is inoperative and void, and this either in a court of law or equity.

But the principle has no application to the case before us. The mortgage here does not undertake to grant, in presenti, property of the company not belonging to them or not in existence at the date of it, but carefully distinguishes between present property and that to be afterwards acquired. Portions of the road had been acquired and finished, and were in operation, when the mortgage was given, upon which it is conceded it took effect; other portions were acquired afterwards, and especially the iron and other fixtures, besides the greater part of the rolling stock.

The terms of the grant or conveyance are: "all present and future to be acquired property of the parties of the first part;" that is to say, "their road, made or to be made, and all rails and other materials, &c., including iron rails and equipments, procured or to be procured," &c. We have no occasion, therefore, of calling in question, much less denying, the soundness of the maxim, so strongly urged against the effect of the mortgage upon the property in question, as its force and operation depend upon a different state of facts, and to which different principles are applicable. The inquiry here is, not whether a person can grant in presenti property not belonging to him, and not in existence, but whether the law will permit the grant or conveyance to take effect upon the property when it is brought into existence, and belongs to the grantor, in fulfilment of an express agreement, founded on a good and valuable consideration; and this, when no rule of law is infringed or rights of a third party prejudiced? The locomotives and cars were all placed upon the road as early as February, 1854,

when, at the furthest, the mortgage attached to those in question, according to its terms, if at all, and the judgment of the defendants was not recovered till May, 1856.

We think it very clear, if the company, after having received the money upon the bonds and given the mortgage security, had undertaken to divert the fund from the purpose to which it was devoted, namely, the construction of the road and its equipment, and upon which the security mainly depended, a court of equity would have interposed, and enforced a specific performance. One of the covenants was, that the money should be faithfully applied to the building and equipment of the road; or if, after the road was put in operation, the company had undertaken to divert the rolling stock from the use of the road, a like interposition might have been invoked, and this in order to protect the security of the bondholders. And if a court of equity would thus have compelled a specific performance of the contract, we may certainly with confidence conclude that it would sanction the voluntary performance of it by the parties themselves, and give effect to the security as soon as the property is brought into existence.

The case of Langton *v.* Hasten (1 Hare's Ch. R., 549) supports this view. The mortgage security in that case was the assignment of the ship Foxhound, then on her voyage to the South seas, together with all and singular her masts, &c., *" and all oil and head matter, and other cargo, which might be caught or brought home on the said ship, on and from her then present voyage."* The cargo was levied on by a judgment creditor on the arrival of the ship at home. A bill was filed to have the mortgage declared a good and valid security for the moneys advanced, and that the complainants be entitled to the benefit of the security, in preference to the judgment creditor.

The vice chancellor, in giving his opinion, observed: "Is it true that a subject to be acquired after the date of a contract cannot, in equity, be claimed by a purchaser for value under that contract?"

And, in answer to the question, he said: "It is impossible to doubt, for some purposes at least, that by contract an in-

terest in a thing not in existence at the time of the contract may, in equity, become the property of the purchaser for value." And, after reviewing the cases in the books, he concludes: "I cannot, without going in opposition to many authorities which have been cited, throw any doubt upon the point that Bixnie, the contracting party, would be bound by the assignment to the plaintiffs."

There are many cases in this country confirming this doctrine, and which have led to the practice extensively of giving this sort of security, especially in railroad and other similar great and important enterprises of the day. (2 Selden R., 179; 3 Green Ch. R., 377; 32 N. H. Rep., 484; 25 Barb., 286; ib., 284; 18 B. Munro, 431; Redfield on Railways, 590, and note; 2 Story R., 630; 7 Jurist, 771; Tapfield *v.* Hillman.)

In the case of Tapfield *v.* Hillman, Tindall, Ch. J., seems inclined to the opinion that, even at law, a mortgage security of future acquisitions might have effect given to it, if the terms indicated an intent to comprehend them.

The counsel for the appellee referred to the case of Chapman *v.* Weimer & Steinbacker, (4 Ohio R., 481,) as denying effect to a mortgage upon after-acquired property. But that was a case at law; and even there the court held that the mortgage attached after the property was acquired, from the time the right was asserted by the mortgagee.

In conclusion upon this point, we are satisfied that the mortgage attached to the future acquisitions, as described in it, from the time they came into existence. As to the claim of the judgment creditors, there are several answers to it.

In the first place, the mortgage being a valid and effective security for the bondholders of prior date, they present the superior equity to have the property in question applied to the discharge of the bonds. It is true, if the property covered by the mortgage constituted a fund more than sufficient to pay their demands, the court might compel the prior encumbrancer to satisfy the execution, or, on a refusal, the mortgage having become forfeited, compel a foreclosure and satisfaction of the bond debt, so as to enable the judgment creditor to reach the

surplus. Or the court might, upon any unreasonable resistance of the claim of the execution creditor, or inequitable interposition for delay, and to hinder and defeat the execution permit a sale of the rolling stock sufficient to satisfy it. But no such ground has been presented, or could be sustained upon the facts before us. On the contrary, it cannot be denied but that the whole of the property mortgaged is insufficient to satisfy the bondholders under the first mortgage, much less when those under the second are included. To permit any interference, therefore, on the part of the judgment creditors, with a view to the satisfaction of their debt, consistent with the superior equity of the bondholders, would work only inconvenience and harm to the latter, without any benefit to the former. (3 Hare's Ch. R., 416; 9 Georgia R., 377; Redfield on Railw., 506; 5 Ohio R., 92.)

In the second place, the judgment sought to be enforced by the defendants was recovered upon bonds of the second issue, and secured, in common with all the bonds of that issue, upon this property, by virtue of the second mortgage. These bondholders have a common interest in this security, and are all equally entitled to the benefit of it; and in case of a deficiency of the fund to satisfy the whole of the debt, in equity, a distribution is made among the holders pro rata. The payment of the bonds of the second issue are also postponed until satisfaction of the issue comprehended within the first mortgage, as the second was taken with a full knowledge of the first. To permit, therefore, one of the bondholders under the second mortgage to proceed at law in the collection of his debt upon execution would not only disturb the pro rata distribution in case of a deficiency, and give him an inequitable preference over his associates, but also have the effect to prejudice the superior equity of the bondholders under the first mortgage, which possesses the prior lien.

As the judgment creditors can have no interest in the management or disposition of the property, except as bondholders, on account of the deficiency of the fund, it is unimportant to inquire whether or not the court was right in refusing a receiver, or to direct a sale of the road with a view to a distri-

bution of the proceeds. For aught that appears, the road has been managed, under its present directors, with prudence and fidelity, and to the satisfaction of the bondholders, the parties exclusively interested.

Another objection taken to the validity of the mortgage is, the want of power under the charter to construct the road from Hudson to Millersburg, and consequently to borrow money and pledge the road for this purpose. There is certainly some obscurity in the statutes creating this corporation as to the extent of the line of its road; but we agree with the court below, that, upon a reasonable interpretation of them, the power is to be found in their charter. They were authorized to construct the road from some convenient point on the Cleveland and Pittsburgh road, in Hudson, Summit county, through Cuyahoga Falls, and Akron, to Wooster, or some point on the Ohio and Pennsylvania railroad, between Massillon and Wooster, and to connect with said Ohio and Pennsylvania road, and *any other railroad running in the direction of Columbus.* It was clearly not limited, in its southern terminus, to its connection with the Ohio and Pennsylvania road, for there is added, " and any other railroad running in the direction of Columbus." The extension of the road to the Ohio Central road at Zanesville, or at some other point on this road, comes fairly within the description.

We have not referred particularly to the authority of the company, under the statute laws of Ohio, to borrow money and pledge the road for the security of the payment, as no such question is presented in the brief or was made on the argument. Indeed, the authority seems to be full and explicit.

Decree below affirmed.