In re MEDINA QUARRY CO.

(District Court, W. D. New York. June 17, 1910.)

No. 2,035.

1. BANKRUPTCY (§ 175*)—FRAUDULENT CONVEYANCES—LEASE TO NEW CORPORATION.

Where, after the insolvency of a quarry company, and within four months prior to its adjudication in bankruptcy, a new corporation was organized at the instance of a bondholders' committee to take over the insolvent's assets and operate the quarries, and a lease of the insolvent's property to the new corporation was made within the three-months period with intent to hinder, delay, and defraud the insolvent's general creditors, and the new corporation did not buy the insolvent's property in good faith, or give a present appropriate consideration therefor, the lease and transfer were void in bankruptcy, as provided by Bankr. Act July 1, 1898, c. 541, § 67 (e), 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 175.*]

---

**2. BANKRUPTCY (§ 186\*)—TRANSFERS—ACCOUNTING.**

Where a new corporation, organized to succeed the bankrupt, took over its assets under a lease which was void for fraud as against creditors, and operated the bankrupt's property for a considerable period, the lessee corporation should not be treated as a trespasser in an accounting of its acts done under the lease, but was only liable for net profits earned after allowance of expenditures other than taxes.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 186.\*] .

**3. BANKRUPTCY (§ 314\*)—CLAIMS PROVABLE.**

Where, on the insolvency of a corporation, a bondholders' committee was formed with which bonds were deposited, the title to the bonds so deposited being vested in the committee which was authorized to act in their discretion for the benefit of the bondholders who subsequently accepted the bonds and stock of a new corporation therefor, there was no such novation as precluded the committee, on using the bonds in part payment for the assets of the bankrupt corporation, to prove the balance of the bonds as an unsecured claim against the bankrupt's estate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.\*]

**4. BANKRUPTCY (§ 336\*)—CLAIMS—AMENDMENT.**

A claim against a bankrupt alleged to be defective because verified by an attorney who failed to assign a reason why it was not personally verified by the claimant as required by bankruptcy general order 21 (89 Fed. ix, 32 C. C. A. xxii) was amendable.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 336.\*]

**5. CORPORATIONS (§ 478\*)—MORTGAGES—PROPERTY COVERED.**

A mortgage executed by a corporation recited that whereas the mortgagor desired to raise money to purchase certain quarries, machinery and other property, the mortgage should cover all the tenements, hereditaments, and appurtenances belonging to the property conveyed, or in any wise appertaining thereto, and all the estate, right, title, interest, property, possession, claim and demand in or to the same, and any and every part thereof, with the appurtenances and all other real property, and all easements, rights of way, buildings, fixtures, tools, appliances, rolling stock, machinery, plants, and franchises. *Held*, that the mortgage as against general creditors covered the after-acquired real estate and after-acquired tools, appliances, horses, hay, etc., and also profits of the business and stone quarried and inventoried after the corporation's assets had been leased to another corporation in fraud of creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1871; Dec. Dig. § 478.\*]

**6. BANKRUPTCY (§ 312\*)—SECURED CREDITORS—FRAUD—SURRENDER OF SECURITY—PROOF OF CLAIM.**

A committee representing bondholders of a bankrupt corporation by conniving to transfer the property so as to hinder and delay creditors, did not deprive itself of its right to a pro rata share of the estate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 312.\*]

**7. BANKRUPTCY (§ 310\*)—SECURED CREDITORS—PROOF OF CLAIM.**

Mortgage creditors of a bankrupt were entitled to prove their claims without surrendering their lien, and if on foreclosure the proceeds of the sale were insufficient to pay the debt in full, they were entitled to share pro rata in the distribution of the general assets, as to the balance.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 310.\*]

In the matter of Medina Quarry Company. On exceptions to the report of the special master. Affirmed.

The Medina Quarry Company (hereinafter called the Medina Company) was incorporated in March, 1902, and conducted stone quarries in Orleans county,

N. Y. Its capital stock was $2,000,000, for which bonds were issued amounting to $1,200,000, secured by a trust mortgage on all its property, real and personal, and such as thereafter should be acquired. The bond issue was to raise money to pay the purchase price of the quarries, machinery, and other property. Out of the total sale of bonds $410,980 was expended in the purchase of real and personal property and the balance, $264,700, remained in the treasury of the company. After purchasing certain other properties, and paying therefor out of the bonds in the treasury of the company, there remained in the treasury on April 4, 1904, bonds amounting to $56,500. On April 1, 1904, a partial default was made in the payment of interest on the bonds, and on October 1, 1904, the company completely defaulted in the payment of interest upon its bonded indebtedness. The insolvency of the company was recognized by the directors and understood by the bondholders. The company, however, continued business with borrowed capital until late in the year 1904, when Kessler & Co., bankers, assumed charge of the business. To secure advances made by Kessler & Co., amounting in the aggregate to $85,000, chattel mortgages were executed by said Medina Company to said company on quarried stone, and assignments of bills receivable were also made to it. A bondholders' committee of 11 members was formed by the directors, and efforts were made to continue the business and to reorganize or readjust the affairs of the company. Subsequently the bondholders' committee and directors acting together organized the Orleans County Quarry Company (hereinafter called the Orleans Company), a corporation, and in the month of December, 1904, they caused to be transferred to it by bill of sale all the property and assets of the Medina Company under an agreement that the latter would pay full value therefor, said value to be ascertained by appraisers. No appraisal, however, was made nor any consideration paid whatever although the Orleans Company took possession under bill of sale and lease and conducted the business up to February 1, 1906. Soon afterwards the attorneys for the Medina Company and several of its officials to whom the company was indebted filed a petition in involuntary bankruptcy against the Medina Company and it was subsequently adjudicated bankrupt in this court. The plan or scheme of reorganization of the affairs of the Medina Company, as indicated by a circular letter dated January 12, 1905, and mailed to the bondholders, was the formation of the aforesaid Orleans Company for the purpose of buying for the bondholders the property and assets of the Medina Company at foreclosure or bankruptcy sale. To carry out this intention the Orleans Company was capitalized at $600,000, and upon acquiring the property of the Medina Company as above stated, first-mortgage bonds were issued, amounting to $350,000, to be secured by trust mortgage upon all its property. Second-mortgage income bonds were also issued, amounting to $200,000, which it was agreed would be divided among such of the first-mortgage bondholders of the Medina Company as had deposited their bonds with the bondholders' committee of 11 members. In accordance with this intention a large number of such bondholders deposited their bonds with the bondholders' committee, the total thereof being $960,400. Subsequently the property and assets of the bankrupt were sold by order of the court to the Orleans Company for the sum of $228,000, and the bondholders' committee were allowed by order of the bankruptcy court to use the bonds to pay the purchase price to the extent to which said bonds were entitled to share in the distribution of the amount realized on the sale. After the sale the bondholders' committee filed a claim as unsecured creditors against the bankrupt for the difference between the par value of the bonds in their possession and the amount for which it was permitted to turn in the bonds in payment of the purchase price. Other facts are so fully stated in the opinion of the special master as to make it unnecessary to repeat them here.

William W. Storrs, for trustee.

Martin Conboy, for certain claimants excepting to report of special master.

Wilber E. Houpt, John J. Ryan, and Lincoln A. Groat, for certain unsecured claimants excepting to report of special master.

HAZEL, District Judge (after stating the facts as above). The matter comes before me on exceptions to the report of the special master to whom a reference was made to take testimony and report to the court on the issues presented. The issues are: (1) Whether the lease and bill of sale dated in December, 1904, by the Medina Company to the Orleans Company, and all claims arising thereunder, are valid or invalid; (2) whether certain claims presented against the bankrupt estate by certain individuals, the Orleans Company, and the bondhold- ers' committee should be allowed as valid claims or expunged; (3) whether the chattel mortgages made by the Medina Company to Kess- ler & Co., creditor, on April 18, 1904, August 30, 1904, and December 23, 1904, and the claims arising thereunder are valid and subsisting liens. The master has reported inter alia that the lease and bill of sale made by the Medina Company to the Orleans Company within four months of the adjudication in bankruptcy was given with the intent and purpose on its part to hinder, delay, or defraud its creditors, and that the Orleans Company did not buy the property in good faith or give "present appropriate consideration therefor," and in his opin- ion, in which I concur, such transfers and conveyances were null and void, under section 67 (e) of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]). And from the facts as found by him, based upon the manner in which the Orleans Company was organized, the acts of the bondholders and their inter- est in the new company, the evident purpose to defraud the creditors of the Medina Company by engaging in a pretended plan of reor- ganization, the occupancy of the quarries under the lease by the Or- leans Company and its conduct of the business for one year under the lease, he concluded that the accounting by the Orleans Company should be on a basis of the earnings and profits during the time it occupied the property and conducted the business under the lease. The principal objection to the confirmation of the special master's report arises from the latter conclusion, it being strongly urged that the Orleans Company was chargeable and should be required to ac- count to the bankrupt estate as a willful and intentional trespasser upon the lands of the bankrupt from the time it took possession under the bill of sale and lease in 1905, to the time of its purchase of the assets in the bankruptcy court. If the facts and circumstances justify the contention of willful and intentional trespass the rule of account- ing adopted by the master in which he allowed the Orleans Company to credit itself with the expenses of operating the quarries, an amount aggregating $177,394.12, and requiring an account only for net profits amounting to $8,924.05, was obviously erroneous. Counsel for objecting creditors have directed my attention to many citations in the courts of the United States and of the state of New York which are claimed to disclose the principle upon which the question of equi- table accounting should have been decided by the special master, but to follow along and closely differentiate such cases from the case at bar would be a work of supererogation, and perhaps involve the court in a maze of unnecessary difficulties. Hence I am content to have famil- iarized myself sufficiently with the facts and circumstances contained

in the voluminous record to enable me to determine that the leasing of the property of the Medina Company to the Orleans Company pursuant to plan of reorganization adopted by the bondholders and directors, through a fraudulent transfer of property, was not a willful trespass and the application of the strict rule of accounting contended for, namely, that the bankrupt, besides the return or value of the property and assets, be awarded the profits thereof without making allowance to the Orleans Company for its expenditures by which such profits were earned, except the amount paid for taxes, is not warranted. The adjudications relating to mining claims or properties, for instance, where the mine has been wrongfully converted, and wherein no credits are allowed to the wrongdoer for improvements or services rendered by him while in wrongful possession seem to me to be entirely inapposite. So, also, the cases relating to wrongfully cutting timber on lands of another and then selling it to a stranger. In such cases the wrongdoer who has increased the value of the thing stolen, for example, by taking out the ore or sawing the timber into boards knowing it to have been wrongfully taken, cannot have his labor or his expenses paid as the price of the return to the original owner. As stated in Wooden Ware Co. v. United States, 106 U. S. 432, 1 Sup. Ct. 398, 27 L. Ed. 230, quoting from Lord Hatherly in the House of Lords, in the case of Livingstone v. Rawyards Coal Co., 5 App. Cas. 25:

"There is no doubt that if a man furtively, and in bad faith, robs his neighbor of his property, and because it is underground is probably for some little time not detected, the court of equity in this country will struggle, or, I would rather say, will assert its authority to punish the fraud by fixing the person with the value of the whole of the property which he has so furtively taken, and making him no allowance in respect of what he has so done, as would have been justly made to him if the parties had been working by agreement."

But this rigorous rule it will be noted is based wholly upon the felonious taking of a peculiar specie of property belonging to another, and in my mind is inapplicable to a case where the owner meaning to defraud creditors gives another who is a party to the fraud the right to enter and conduct the business of the transferror. The special master in my opinion properly accepted as a guide the equitable principle of accounting enunciated in Loos et al. v. Wilkinson, 113 N. Y. 485, 21 N. E. 392, 4 L. R. A. 353, 10 Am. St. Rep. 495, and therefore the exception is overruled.

The next question is based upon the exception that the bondholders' committee obtained an assignment of the Medina Company bonds from certain of the bondholders in trust, and, said bondholders having subsequently accepted the bonds and stock of the Orleans Company, that such acceptance was in legal effect a novation. The question is not entirely free from difficulty or doubt. The argument proceeds upon the theory that the bondholders who deposited or surrendered their bonds to the bondholders' committee received full equivalent in the new company, and are therefore estopped to receive anything on their claims from the bankrupt estate. Upon this subject the special master found as follows:

"XIII. The legal title to bonds represented by the said bondholders' committee was vested in said committee by each of the holders of said bonds at the time of the assignment thereof to said committee, and furthermore, each of the holders of said bonds of the Medina Company did make, constitute and appoint the said bondholders' committee as his attorney in fact to do any and all things it may deem necessary to be done to carry out the intention and purpose of the said bondholders' committee agreement, and that the acts of said committee were ratified and confirmed by said agreement by each of the said bondholders; that the signing, verification and proof of the said claim by the said bondholders' committee were authorized by each of the bondholders of the Medina Company whose bonds were placed with the bondholders' committee; that the bonds represented by the claim of the said bondholders' committee have been duly filed with the trustee of the bankrupt herein."

I am satisfied by the record that the bondholders who deposited their bonds with the bondholders' committee under the conditions contained in the printed circular letters of September, 1904, vested in such committee the legal title to the bonds with power and authority to do with them as they saw fit towards conserving the property of the Medina Company, and providing means for their protection. No evidence is found to show that a novation was intended or implied. The subsequent transactions indicated the intention of the bondholders' committee to buy the properties of the Medina Company with the bonds and then make a claim against the bankrupt estate as unsecured creditor for the difference between the amount allowed as dividends and the par value of the bonds.

In connection with this question the point is urged that the said claims for allowances filed herein were not properly authenticated or proved. They were personally verified by only eight out of ten members of the bondholders' committee, and by an attorney who acted as agent and proxy for M. B. Chapman and H. Leroy Randall, the two remaining members of the committee. The verification of the attorney failed to assign a reason why the claimants had not personally made it as required under general order 21 (89 Fed. ix, 32 C. C. A. xxii). I think in view of the relations of the bondholders and the committee as evidenced by their agreement that the filed claims sufficiently conform to the provisions of section 57 of the bankrupt law. While the verification by the attorney is thought defective yet under the doctrine of the cases of In re Roeber, 127 Fed. 122, 62 C. C. A. 122, and Hutchinson v. Otis, 190 U. S. 552, 23 Sup. Ct. 778, 47 L. Ed. 1179, an amendment to conform more strictly to the requirements of the bankrupt act and general orders would not be improper. This ruling also applies to the objection to the verification by Kilborn of the claim of Kessler & Co. While the irregularity was pointed out and insisted upon at the time of the filing with the referee and overruled by him, still upon the authorities cited, I think it is within the power of the court to permit the claimant to amend its claim. According to the objecting creditors the claims of Griggs, Baldwin & Baldwin, L. D. Baldwin, L. D. & A. J. Baldwin, Coler & Co., Burd S. Coler, Randall, Fancher, Scanlon, Edmund Seymour & Co., W. K. Gillette, Kessler & Co., and O'Brien & Co., have actually been paid in full by the Orleans Company, and they should therefore be disallowed herein.

As to the claims of Griggs, Baldwin & Baldwin, Leonard D. Baldwin, L. D. & A. J. Baldwin, the special master found on review of the testimony that such claims were not paid by the Orleans Company. as contended by the trustee. I concur in his findings of fact upon these various matters. As to the claims of Coler & Co. of $8,952.52, Randall of $8,877.75 and of Baldwin of $4,440.84, the special master found that the money paid them was advanced by the Orleans Company after they filed their claims of indebtedness and that in May, 1906, such claims were assigned to the Orleans Company. Under the circumstances there is no substantial reason why said claims should be allowed in this proceeding. Bradley v. Lehigh Valley R. Co., 153 Fed. 350, 82 C. C. A. 426.

The next important question is whether the special master erred in holding that certain property of the bankrupt consisting of tools and appliances, etc., valued at $39,000, and two pieces of land described as parcels Nos. 27 and 28, bought by the Medina Company after the trust mortgage was delivered were covered by the lien and whether the general creditors should not participate in the distribution of such amount to the exclusion of the bondholders. The mortgage contains the following clauses:

"Together with all and singular the tenements, hereditaments, and appurtenances belonging to the property hereby conveyed, or in any wise thereto appertaining, * * * and also all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, to the party of the first part in or to the same, and any and every part thereof with the appurtenances and all other real property."

And further—

"all easements, rights of way, buildings, fixtures, tools, appliances, rolling stock, machinery, plant and franchises now owned by the company."

And in the opening paragraph:

"Whereas the said party of the first part desires to raise money for the purpose of purchasing certain quarries, machinery and other property," etc.

It will be noted that the language covers both real and personal property in general and specific terms, and from the last excerpt the assumption is not unwarranted that the creditors had notice of the scope of the lien when their course of dealing with the Medina Company began. Reliance is placed upon the decision by the Court of Appeals of this state in Zartman v. First National Bank, 189 N. Y. 267, 82 N. E. 127, 12 L. R. A. (N. S.) 1083, affirming 109 App. Div. 406, 96 N. Y. Supp. 633, and New York Security Co. v. Saratoga Gas Co., 159 N. Y. 137, 53 N. E. 758, 45 L. R. A. 132, in support of this contention. In the New York Security Company Case the mortgage in addition to covering all the property and plant purported to include future earnings in the business and the product of manufacture. In default in payment of interest the mortgagee was empowered to enter and conduct the business and appropriate the income to the payment of the lien. The Court of Appeals at the close of the opinion stated the controlling principle as follows:

"We think that justice and equity are best promoted by limiting the right or lien of the bondholders to such earnings only as shall accrue after the

mortgage trustee of the receiver shall have actually taken possession. The earnings prior to that time should in equity ·be awarded to the general cred- itor."

In the Zartman˙ Case, supra, the terms of the trust mortgage were not unlike the mortgage in controversy. There possession was taken by the inortgagee on default in the payment of interest a few days before proceedings in bankruptcy were instituted, and the primal ques- tion was whether the clause of the mortgage covering after-acquired . personal property was enforceable as to the stock and material on hand at the time possession was taken under the mortgage. It was not questioned but that the lien of the mortgage covered the ma- chinery, tools and.appliances in the plant, and reading the opinion will show, I think, that the court did not intend to disturb its prior ruling that after-acquired securities, as distinguished from supplies, product, or material, and not in existence at the time of making the mortgage were equitably included therein. .Central Trust Co. v. West India Co., 169 N. Y. 314, 62 N. E. 387; Carpenter v. Black Hawk Gold Mining Co., 65 N. Y. 43; N. Y. Security & Trust Co. v. Saratoga Gas Co., 88 Hun, 569, 34 N. Y. Supp. 890, affirmed 157 N. Y. 689, 51 N. E. 1092; Mitchell v. Winslow, 2 Story, 630, Fed. Cas. No. 9,673; Pennock et al. v. Coe, 23 How. 117, 16 L. Ed. 436.

Hence the special master was right in holding that the real estate, the lots above mentioned, the tools and appliances, the horses and hay, acquired after the date of the mortgage, are included in the lien. Assuming this to be the law as to after-acquired property, it is never- theless insisted that the effect of said decisions is that the profits of the business wrongfully conducted by the Orleans Company in 1905, together with quarried stone or "stone inventoried" not covered by subsisting liens, and not in existence at the time the mortgage was made to secure bondholders, not only belong to the bankrupt estate, but, because of the failure of the bondholders to cause the prosecu- tion of the foreclosure action, the general creditors only are equitably entitled to participate in the proceeds realized on sale of such proper- ties. I am unable to accept this view. The bondholders, it is true, had rights under the mortgage of which they did not avail them- selves, but under the bankruptcy law they still had the absolute right to relinquish their security and prove their debt in the bankruptcy court. They could have proven their claims without surrendering the lien, and if they had foreclosed the mortgage and the proceeds of the sale had been insufficient to pay the debt in full they were not barred from sharing pro rata in the distribution of the general assets. Such was the rule under bankruptcy act of 1867 (Act March 2, 1867, c. 176, 14 Stat. ,517; In re Ruehle, 2 N. B. R. 175, Fed. Cas. No. 12,113), and is the rule under the act of 1898 (sections 57e and 57b). The bondholders' committee waived and surrendered its security, and elected to file claims in the bankruptcy court entitling it to participate in the distribution of the assets as general creditors. By conniving to transfer the property to hinder and delay creditors the bondholders' committee did not deprive itself of its pro rata share in the estate.

There remains to briefly consider the objection that Kessler & Co. received a preference within four months of the bankruptcy in that

bills receivable were assigned to said firm, they knowing of the insolvency of the Medina Company, and hence that their debt of $83,-625, which was allowed by the master as an unsecured claim, should be rejected unless such preferential payments are surrendered. The transactions between the Medina Company and Kessler & Co., consisting of an agreement to advance to the company at different times large amounts of money, the three chattel mortgages giving the bankers the quarried stone or stone inventoried, the assignments of book accounts as collateral security for promissory notes and renewals thereof, and the question of priority of payment under the chattel mortgage of August 26, 1904, are detailed with considerable care in the opinion of the special master. His conclusion on the evidence that the two earlier chattel mortgages and the assignments of bills receivable were made in good faith, and that the chattel mortgage of December, 1904, upon future products to secure loan of $25,000, was an intentional preference is approved. I also concur in the reasoning which prompted the master to refuse priority of payment on the chattel mortgage, dated August 26, 1904.

In passing upon the principal exceptions argued at the bar by the dissentient creditors represented by Messrs. Houpt, Groat & Ryan, it was necessary to also familiarize myself with the exceptions filed to the report of the master by Mr. Conboy, counsel for other creditors and the bondholders' committee, and I have carefully considered them, but in my judgment they are without merit and are therefore overruled save as to the claim that the Orleans Company should be allowed $8,320.41, which it paid for stone on which the contractors are claimed to have had liens and the asserted mistake of charging the Orleans Company with certain items of stone shipped to Chapman & Company. These indicated errors counsel and the trustee in bankruptcy will doubtless be able to agree upon, and the order may incorporate the necessary provision in respect thereto. If no agreement is reached as to these items a hearing may be had in relation to the same on settlement of the order.

In closing I wish to add that the comprehensive findings of fact and conclusions of law by the special master, together with his able opinion have been of much assistance to me on this review. The objecting creditors have vigorously contended that the larger claimants and the bondholders' committee were parties to a willful and deliberate scheme to defraud the general creditors of the Medina Company and that therefore there were no equities in their favor on any of the questions herein presented, but in the solution of the various problems submitted and studied, the fact that the Medina Company from the time of its incorporation was in financial straits cannot be ignored. It is undeniable that the scheme to reorganize was fraudulent and designed to benefit the larger creditors and bondholders, but I think the special master comprehended the equities on all sides and from my point of view correctly stated the law. The trustee in bankruptcy has not opposed the confirmation; he frankly taking the position that the dispute had been fairly considered and decided by the master.

The report of the special master is affirmed.