JACKSON *v.* LUDELING.

VICKSBURG, SHREVEPORT, AND TEXAS RAILROAD COMPANY
*v.* JACKSON.

1. In Louisiana, where a railroad, in a state of complete dilapidation and ruin, was sold under a mortgage, under circumstances which, importing some fraud in the purchasers, induced the court to set the sale aside and order a resale, such purchasers, though deemed possessors in bad faith, are entitled, by the spirit of article 508 of the Civil Code of that State, to compensation for reconstructing and repairing the road and putting it in working order.

2. Whatever question may exist about compensation for inseparable improvements made by a possessor in bad faith, there is no question about his right to be reimbursed for necessary repairs, both according to article 2314 of that code and to the general civil law.

3. It seems to be held in Louisiana, contrary to former decisions, that conpensation will not be allowed to the possessor in bad faith for inseparable improvements to land, such as clearing and ditching; but reconstructing a railroad and putting it in working order, thereby restoring it to its normal condition, partake so much of the nature of repairs, that compensation therefor is required, by an equitable construction of article 508 of the Civil Code.

4. The rule of compensation in such a case is to allow credit to the possessors for the value of the materials of such improvements as are yet in existence, and the cost of the labor bestowed thereon, not to exceed their value when delivered up; but not for the improvements which were consumed in the use. Interest on the outlay of the possessors will also be allowed to an amount not exceeding the net earnings, or fruits, received from the improvements. They will be accountable, however, for all the fruits received by them from the property, and will have a lien on it for any balance found to be due them on such an accounting. *Quære,* Are they accountable for such fruits beyond the allowance made to them for the improvements.

APPEALS from the Circuit Court of the United States for the District of Louisiana.

The facts are stated in the opinion of the court.

*Mr. John A. Campbell* and *Mr. H. M. Spofford* for Jackson.

*Mr. Jeremiah S. Black, Mr. Matt. H. Carpenter,* and *Mr. John T. Ludeling, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case, like *Parsons* v. *Jackson* (*supra,* p. 434), arises out of the supplementary proceedings which took place in the case of *Jackson et als.* v. *The Vicksburg, Shreveport, & Texas Rail-*

*road Co.* (reported as *Jackson* v. *Ludeling* in 21 Wall. 616*),
after our decision therein.   In pursuance of the mandate in
that case, the Circuit Court for the District of Louisiana made
a further decree on the twenty-second day of March, 1875,
containing. amongst other things, the following directions, that
is to say : –

" 2. It is further adjudged and decreed that the writ of in-
junction directed by the decree issue to the parties to the deed
of the 5th of February, 1866, executed to John T. Ludeling
and his associates, and to all of the defendants in this cause,
according to the directions of said mandate, and that they be
required to cancel the said deed, and deliver the same as can-
celled to the master of this court hereinafter named.

" 3. It is ordered that F. A. Woolfley be appointed special
master to receive the said deed as cancelled ; to take the proofs
of the bonds *bona fide* issued, &c. ; that he take an account of
·the property embraced in the mortgage described in the bill
executed to John Ray or bearer, which was not sold or dis-
posed of prior to 23d December, 1865, and render the account
between the plaintiffs and ·defendants provided for in the
decree aforesaid.   He will give notice to the holders of bonds,
&c.   He will give notice to the defendants, or their solicitor,
of his taking the account, and for all purposes of his duties
under this order he may refer to the testimony on file in the
cause, and shall also report upon the sale of the property and
the best mode of effecting it, so as to promote the interests of
all concerned under the decree.   He is authorized to make
special reports from time to time to the court, and to ask for
instructions.

" 4. It is further ordered that John W. Greene be appointed
receiver under the decree to collect, receive, and hold posses-
sion of all of the estate, property, and effects described in the
mortgage aforesaid, executed to John Ray or bearer, by the
Vicksburg, Shreveport, and Texas Railroad Company, not sold
or disposed of prior to the 23d of December, 1865, and to hold
the same subject to the orders of this court."

To understand the questions that are raised on the present
appeal, it is necessary briefly to rehearse the history of the case.

The Vicksburg, Shreveport, and Texas Railroad Company,

on the first day of September, 1857, by an authentic act of mortgage, did grant to John Ray a first-mortgage lien and privilege upon its entire railroad from the Mississippi River, opposite Vicksburg, by way of Monroe and Shreveport, to the boundary line of Louisiana and Texas, a distance of one hundred and ninety miles, more or less, including right of way, lands, property, and franchises of every description, with all its rolling-stock, machinery, and effects, including also a land-grant of over four hundred and twenty thousand acres, — to secure the payment of a contemplated issue of two thousand bonds, of $1,000 each.   A considerable portion of these bonds were issued; but the disturbances arising from the late civil war resulted in the destruction of the company's property, and default in the payment of interest on the bonds.   In the month of December, 1865, an order of seizure and sale was made by the Twelfth District Court of Louisiana, for the sale of the mortgaged premises, at the instance of one William R. Gordon, a holder of some of the bonds; and on the third day of February, 1866, the whole property was sold by the sheriff of the parish of Ouachita to John T. Ludeling and others, for the sum of $50,000; and a regular act of sale was passed to them on the tenth day of February, 1866; and they thereupon took possession of the property, and commenced to reconstruct the same and put it in repair.   A large number of the bondholders, however, on the first day of December, 1866, filed their original bill in this case, complaining that the said proceedings were irregular and fraudulent, and praying that the said sale might be set aside, and that the property might be again sold by virtue of the mortgage for the benefit of all the *bona fide* bondholders; and that the purchasers under the first sale might be decreed to account for all moneys received, or which they might have received, 'from the use of the property ; and for an injunction and receiver.   This bill was dismissed by the Circuit Court; but that decree was reversed by this court, and a decree made in favor of the complainants, establishing the mortgage, declaring the sale to Ludeling and his associates fraudulent and void, and setting it aside, and ordering an injunction against them to refrain from setting up any title by reason thereof.   The cause was thereupon remitted to the

Circuit Court with instructions to direct an account to be taken of all the property of the corporation, to appoint a receiver thereof, and to order the same to be sold for the benefit of the bondholders. It was further ordered and decreed that the defendants should account for all money and property received by them out of the property, or from its profits or income, receiving in their account such credits as, under the circumstances of the case, by the law of Louisiana, they were entitled to, and that they should pay and deliver to the receiver whatever on such accounting might be found due from them. A mandate was issued corresponding to this decree; and in obedience thereto the decree of the Circuit Court was made, which is first above recited. In pursuance of this decree an accounting was had, in which the amounts received by the defendants from the earnings of the railroad were stated and in which the defendants claimed large allowances for expenditures made by them in rebuilding and repairing the railroad and its appurtenances, and in providing it with rolling-stock, machinery, &c. The plaintiffs resisted all claim for allowances to the defendants, beyond the necessary expenses of operating the road; and whether any, and what, allowances should be made to them is the principal question in the cause. The court below made such allowances, decreeing, amongst other things, as follows: —

" *Third,* That the defendants have expended on said mortgaged property in the making of improvements and betterments thereon, which still remain upon said property ready to be turned over, the sum of four hundred and eighty-eight thousand one hundred and nine dollars and fifty-four cents ($488,109.54), on which they are entitled to interest from the date of said expenditures, at the rate of five per cent per annum, until said mortgaged property was placed in the hands of a receiver by this court; that defendants have received from the earnings of said property, over and above all sums paid out for maintenance of said property and running expenses, the sum of one hundred and sixty-one thousand four hundred and seventy-six dollars and sixty-nine cents, for which they should account, with interest at the rate of five per cent per annum from the receipt of said sum; that the interest on said sum expended

and said sum received by the defendants should be computed for the same period of time, or what is equivalent thereto, the said sum received should be deducted from the said sum expended and the interest computed on the remainder; that after making said deduction the remainder is three hundred and twenty-six thousand six hundred and thirty-two dollars and eighty-five cents ($326,632.85), which with interest added from the time when interest should be computed, up to April 13, 1875, when the receiver of this court took possession of said property, amounts to three hundred and ninety-one thousand nine hundred and fifty-nine dollars and forty-two cents ($391,959.42), for which sum defendants are entitled to compensation out of said property, to be raised in the manner hereinafter set forth.

" *Fourth*, That article 508 of the Revised Code of Louisiana, which authorizes the owner of property to require the removal or demolition of the improvements made in his land by a third person, or to keep them at the value of the materials and cost of the workmanship, is not applicable to this case, because the plaintiffs are mortgagees and not owners, and because the removal of many of said improvements is impossible, and because said improvements cannot be demolished without destroying the property of which they form a part, and therefore the claim to said election made by plaintiffs under said article of the code is disallowed.

" *Fifth*, That all of said mortgaged property, including the improvements placed thereon by the defendants, shall be set up at the price of $833,098.38, the actual value thereof, as shown in the report of the experts; and that if this sum or a greater amount be obtained at the sale the defendants shall be entitled to the sum of $391,959.40, fixed as the value of their improvements and interest thereon, as settled in the third paragraph of this decree; and if the said sum of $833,098.38 cannot be obtained, then they shall have in the same proportion of the sum actually obtained as that sum bears to the upset price aforesaid if any less amount shall be obtained.

" *Sixth*, That the holders of a majority of the bonds and coupons shall be at liberty to agree upon a committee to purchase the property for their account upon articles and terms of asso-

ciations, and with concessions to any bondholder to become a party thereto at or within fifteen days from the day of sale. Should the purchase be made, the purchasers shall not be required to make a payment beyond the costs, charges, expenses of the sale, and the amount of the judgment in favor of the defendants hereinbefore stated, with five per cent interest to the day of sale, which shall be a privilege upon the proceeds of sale; and the said purchasers shall be entitled to credit their bonds with the sums that may be due from the purchasers on them as a part of the payment."

From this decree both parties have appealed; the complainants insisting —

1. That no allowance at all should have been made to the defendants for ameliorations and improvements.

2. That the allowances made are too great.

3. That interest should not have been allowed.

The defendants, on the other hand, insist —

1. That the allowances made are insufficient in amount.

2. That no allowance is made for improvements worn out in the service of the railroad.

3. That an insufficient amount of interest is allowed.

4. That no allowance is made for salaries and contingent expenses, taxes, &c.

5. That it does not enforce the right of the defendants to retain possession until their claim for improvements is paid.

6. That the account of earnings is incorrectly stated.

Other errors are assigned, but they are either included in those stated, or are not of sufficient importance to require serious consideration.

Assuming that the determinations of this court in its former decree are not open to further question, and that the defendants acquired possession of the property by a proceeding which was founded in fraud, still it cannot be doubted that they supposed themselves to be the legal owners of the property by virtue of the judicial sale, and made the repairs and improvements in controversy under that idea. But as the vice of their title consisted in their own inequitable acts and proceedings, we think that they are to be regarded, in the language of the civil law, as possessors in bad faith. The common law allows

nothing to the possessor in good or bad faith for expenditures made upon land from which he is evicted by superior title; but equity, in cases within its jurisdiction, allows the possessor in good faith both for repairs and improvements; but where the possessor (being a trustee) has been guilty of actual fraud, it makes him no allowance for improvements, but allows him compensation for necessary repairs. Lewin, Trusts, 466. The present case, however, is to be governed by the law of Louisiana, which is based upon the civil law, not precisely as laid down in the compilations of Justinian, but as interpreted in the jurisprudence of France and Spain; and has some peculiar rules on this subject. When Louisiana was acquired by the United States in 1803, it had been a colony of Spain for more than thirty years, except in the formal transfer to France at the time of our purchase; and the Spanish law was the common law of the Territory until modified by subsequent legislation. In 1808, the first civil code was adopted, based partly on the Spanish Partidas and partly on the *projet* of the Code Napoleon, the completed code not having yet been received. In 1825, the Civil Code was revised, and was made to conform more closely to the French code, often copying its phraseology. The provisions of the code which have the nearest application to the present case are the same both in the code of 1808 and 1825, and are very nearly an exact copy of the corresponding provisions of the Code Napoleon, whilst they also correspond, substantially, with the Spanish law. They are as follows: —

"ART. 508. When plantations, constructions, and works have been made by a third person, and with such person's own materials, the owner of the soil has a right to keep them, or to compel this person to take away or demolish the same.

"If the owner requires the demolition of such works, they shall be demolished at the expense of the person who erected them, without any compensation; such person may even be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.

"If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship, without any regard to the greater or less value which the soil may have acquired thereby.

"Nevertheless, if the plantations, edifices, or works have been

done by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed *bona fide*, the owner shall not have a right to demand the demolition of the works, plantations, or edifices, but he shall have his choice either to reimburse the value of the materials and the price of workmanship, or to reimburse a sum equal to the enhanced value of the soil."

"ART. 2314. He to whom property is restored must refund to the person who possessed it, even in bad faith, all he had necessarily expended for the preservation of the property."

These articles are substantially equivalent to articles 555 and 1381 of the Code Napoleon. They are also nearly equivalent to the laws of the Partidas. The latter divide ameliorations into three kinds, — necessary, useful, and voluntary : *Necessary*, such as preserve the property and prevent it from going to ruin, as repairs to a house, causeways to prevent inundations, &c. ; *Useful*, such as augment the value of the property and its rents, as the planting of trees or vines, the erection of a furnace, wine-press, barn, or stable ; *Voluntary*, such as are made for ornament or pleasure. The Partidas declare that if the possesssor in bad faith makes necessary repairs, or does other things by which the estate is benefited, he may recover the expense thereof, less the amount of rents received, and will not be obliged to deliver the property to the owner until such compensation is made. But if he construct an edifice, or plant seed, he can only deduct the expense from the fruits for which he is made accountable ; or if he has defrayed expenses for works of profit and utility, and the owner is unwilling to reimburse him, he may carry away the additional works which he has erected. Partida III. title 28, laws 42, 44 ; Escriche, titles *Mejores* and *Poseedor de mala fe*.

From these laws it seems clear that for necessary repairs the possessor, even in bad faith, is entitled to full indemnity ; and for useful improvements, he will also be entitled to full indemnity to the value of the materials and price of workmanship, if the owner elects to retain them ; or the right to demolish them and remove the materials, if the owner shall elect not to retain them. The general principle upon which this law is founded is that no one should be made richer at the expense of another, even though the latter has acted in bad faith.

The question then arises how the laws which we have quoted are to be applied in a case like the present, — the case of a railroad which was in a state of ruin and dilapidation, and which the purchasers have repaired and put in working order. Are they to be indemnified in any way, or to any extent, for the expense which they have been at, or are they to lose it all?

We have no great difficulty in considering the parties as holding the relation of rightful owners on one side, and ejected possessors on the other. Both claim under the same title, — the mortgage; and the question between them was, whether the derivative title of the defendants was a valid one or not. The complainants, if not the owners, represent the owners, namely, the railroad company, which is conceded to be utterly insolvent and practically out of existence. So far as the parties are concerned, therefore, the laws above quoted may be regarded as applicable to them.

But, in regard to the subject-matter, it seems almost impossible to apply them literally. It is not like the case of lands, either in the country or the town. These may be recovered and enjoyed by the owner, though the improvements erected thereon be demolished. But a railroad is not land: it is a peculiar species of property, of a compound character, consisting of roadway, embankment, superstructure, and equipment. These constitute the *corpus* of the property. There is no room to exercise the election which the law gives to the owner, of keeping the ameliorations, or requiring the ejected possessor to demolish them. The demolition of the ameliorations would be the demolition of the thing itself. If any room for election does exist, it is virtually made in bringing the suit to recover the property. To carry out the spirit of the law, therefore, since we cannot carry out its letter, the other alternative, of allowing the defendants compensation for their ameliorations, seems to be the only course that is left. Its propriety in this case is corroborated by the fact that the property in its improved state has been taken possession of by a receiver at the instance of the complainants, and has been used for their benefit for now nearly four years past.

In addition to these considerations, it is very questionable whether a large portion of what are called ameliorations in

this case are not rather to be regarded as repairs. The rail-
road has been rescued from destruction and repaired by the
defendants. These repairs were necessary in order to restore
the property to its condition and quality as a railroad, — the
thing which the mortgage contemplated, and which the com
plainants seek to possess under and by virtue of the mortgage.
So far as the improvements may be regarded as necessary
repairs, there is no question that the defendants would be
entitled to compensation for their expenses in making the
same. But as it is impossible to distinguish what might prop-
erly be called repairs from ameliorations, we think that the
rule laid down in the law for the case where the owner elects
to keep the constructions and works erected by the unlawful
possessor may be equitably applied. This rule is that the
latter shall be reimbursed the value of his materials and the
price of the workmanship. This was the rule adopted by
the Circuit Court, and we think that its decision in this respect
was correct, except that, in an equitable application of the rule,
the allowance made to the defendants should not exceed the
value of the improvements. For this amount, therefore, with
interest, less the fruits received, the defendants should have
remuneration.

After a careful examination of the authorities bearing upon
the case, we find nothing which, properly considered, derogates
from this view of the case. The class of cases which comes
nearest to the present is that of lands which have been cleared
up, and brought to a state of cultivation by embankments and
ditches: though even here, there is a point of difference which
it is material to notice; namely, that such clearings and reclama-
tions of new land involve a change in its character, which was
not produced by the rehabilitation of the railroad. The repairs
made on the latter had the effect to restore the property to its
first estate and use; and the expenditures for that purpose are
such as the true owner must necessarily have made, in order to
have the property in the only form which its nature and uses
admit of, and which the mortgage contemplated.

A leading case in Louisiana relating to clearing and re-
claiming land is *Pearce* v. *Frantum*, decided in 1840, and
reported in 16 La. Ann. 414. In that case, the defendant

had settled on the land, supposing it to belong to the United States, and that he had a right of pre-emption to it; but it turned out to be an Indian claim under which the plaintiff's title was derived. Whether the defendant was a possessor in good or bad faith the court do not seem to have decided, and do not appear to have regarded it as material. The defendant cleared about one hundred and fifty acres of the land, and put up a very ordinary dwelling on it, and some cabins. The clearing was the principal improvement; and with regard to the defendant's claim to compensation therefor, the court said: " The right of the defendant to be paid for the improvements by which the value of the premises was enhanced depends upon other provisions of law. It rests upon the broad principle of equity, that no man ought to enrich himself at the expense of another. If instead of recovering four hundred arpents of waste land, covered with heavy timber, the plaintiffs succeeded in establishing their title to that quantity, of which one hundred and fifty is ready for the plough, together with the convenience of a dwelling and a gin, the result of the industry of his adversary, he cannot justly resist the latter's claim for remuneration. If the party evicted be entitled to be paid for edifices erected on the premises, of which the successful party has taken possession, no plausible reason can be perceived why he should lose the lasting conquest his industry has achieved over the forest."

On a reargument of the case, the court, in support of the same views, further said: " The character of Frantum's possession, his liability to restore fruits upon eviction, and his right to be paid for useful improvements, are to be determined by the provisions of the code of 1808, and the Spanish law then in force. Admitting that the provisions of the code itself left it doubtful whether Frantum was or was not a possessor in bad faith, in that sense which would deprive him of a right to claim for improvements, yet, the forty-fourth law, twenty-eighth title, of the third Partida, appears fully to sustain the court in the position first assumed; to wit, that ' in respect to the right to be reimbursed for useful expenses, by which the property has been made more valuable to the owner, the code makes little or no distinction between the possessor in good

or bad faith.' The words of that law of the Partida are: ' Men may incur expenses on account of other persons' houses or lands, not by erecting new works there, but by making necessary repairs, or doing other things there by which the estate is benefited. In that case, we say that if such expenses were necessary, they who made them may and ought to recover them back, while in possession of the estate upon which they expended them, whether they hold in good or in bad faith; and, though the owner may evict them by a judgment of the court, they will not be obliged to deliver him the house or estate until he shall have paid the expenses incurred on account of the same.' "

The court also cites Merlin, as follows: " Merlin, after treating this subject *ex professo*, and in a manner as usual with that author, which leaves little to be said on either side, and after discussing the opinions of Cujas, Favre, and other distinguished doctors, opinions not always in harmony with each other, sums up his conclusions in the following manner. . . . We may, therefore, lay it down as a settled rule, that the proprietor who sues for an immovable (*un fonds*) never ought to enrich himself at the expense of the possessor, whether in good or in bad faith, no matter in what manner the maxim ought to be applied." Repertoire de Jurisprudence, verbo Amelioration, 16 La. 431.

Quite a number of cases, which it is not necessary to quote, followed the general reasoning of this case. In *Beard* v. *Morancy* (2 La. Ann. 347), decided in 1847, the court allowed a party compensation for improvements of the same kind as those in *Pearce* v. *Frantum*, made after judicial demand, and after judgment of eviction; holding that they were necessary improvements, and that the rule of compensation should extend to such, though not to improvements merely useful. The court say: " But there can be no doubt that the party evicted is entitled to be paid for necessary improvements. The improvements in this case were clearings, levees, and ditches, without which the land could not have been brought into cultivation, so as to yield the rents and profits which the plaintiff now claims."

If the Supreme Court of Louisiana was correct in this case

in holding that the ameliorations made by the defendants were necessary improvements, taking into view the fact that the character of the property was changed thereby from its original condition, then, much more in the present case ought the improvements effected by the defendants to be regarded as necessary, resulting as they did in the restoration of the property to its original and normal state. It is for the use by the defendants of these very improvements that the complainants are seeking, in this suit, for an account of fruits and profits of the estate.

There is a series of cases, however, in which it is held by the Supreme Court of Louisiana that a person without title, going into possession of the public lands of the United States, cannot set up a claim for improvements against the government or its grantees. This was decided in *Jenkins* v. *Gibson*, 3 La. Ann. 203; in *Hollon* v. *Sapp*, 4 id. 519; and in *Jones* v. *Wheelis*, 4 id. 541. In *Hollon* v. *Sapp*, the court say expressly, " We are of opinion that this article of the code is not applicable to materials used and labor expended in making settlements upon the national domain. No right can be acquired in relation to the public lands except under authority of Congress."

The case of *Gibson* v. *Hutchins* (12 id. 545) is much relied on by the complainants, and in its general reasoning does undoubtedly overrule the doctrine of *Pearce* v. *Frantum*, though, as in *Jenkins* v. *Gibson*, *Hollon* v. *Sapp*, and *Jones* v. *Wheelis*, the title of the land was in the government when the improvements were made. The court say: " The mere possessor is presumed to have made such changes for his own amelioration, and to have received a sufficient reward in the immediate benefit which he reaps from the enhanced production of the soil. Perhaps the true owner would have preferred that the primitive forest should remain. Perhaps the ditching will not suit the purposes for which he wishes to use the land." It is evident from the reasons here given that the court regarded the change of the condition and character of the land as a material circumstance, and the suggestion is not without force, that the owner might have preferred that the original timber of the forest should not have been destroyed. The present case, as already intimated, is distinguishable from *Gibson* v. *Hutchins*, and others

of like character, in that the character of the property is not changed by the improvements, but the property is restored to its original condition, purpose, and use, and to the only condition and use which it is susceptible of, and which makes it what it is, — a railroad. It is this aspect of the present case which gives to a large portion of the improvements made the character of necessary repairs.

But the fact that the title to the land in the case of *Gibson* v. *Hutchins* was in the government when the improvements were made is sufficient, of itself, to place it in a different category from the present. The court, indeed, say: "He" (the defendant) "had no claim against the United States for improvements. He was rather indebted to the United States for the privilege of living so long undisturbed upon the public land. And the United States ceded its rights to the plaintiff's authors. They took it free from any legal demand against either the government or themselves for improvements." 12 La. Ann. 547. Reference is then made by the court to *Pearce* v. *Frantum*, and other cases, as being overruled. But one of the grounds for overruling them is stated to be that they sustained a claim for improvements against the United States. "The overruled cases," said the court, "conceded to a settler upon the United States lands, who possessed with the hope of securing a pre-emption, the right of retaining the land against a vendee or patentee of the United States government until such patentee should reimburse the settler the increased value of the property as resulting from improvements and expenses upon it during the settlement." It is true, the court adds, "we said in *Hemkin* v. *Overly*" (a case which seems not to have been reported) "that 'we are unable to recognize the doctrine that one who makes improvements upon property to which he knows he has no title has any legal or equitable claim to reimbursement for such improvements.'" But with the feature referred to, —namely, the right of the government, present in the case of *Gibson* v. *Hutchins*, to which so much importance is given, — it is impossible to regard it as a decisive authority on the general question of a possessor's right to compensation for improvements which are inseparable from the land.

It must be conceded, however, that in several subsequent cases the Supreme Court of Louisiana has used expressions indicating an intention to adhere to the general views enunciated in *Gibson* v. *Hutchins*, and to hold that for improvements of the kind referred to the only compensation which the maker of such improvements can claim is the benefits which he has enjoyed from the use of them. Thus, in *Cannon* v. *White* (16 La. Ann. 91), the defendant having been adjudged a possessor in bad faith, the court held that he was entitled to no other claim for improvements than those stated in the first three sections of the article of the Civil Code before recited. Art. 508. The improvements consisted of a clearing of two hundred and thirty acres of land, and of certain erections on the land, costing $5,250. The clearing was set off in compensation of the fruits and cord-wood derived from the land cleared, which, the court said, would more than compensate for the clearing made. As to the erections, the plaintiff was decreed to elect in thirty days whether he would keep them and pay for their cost, or not; if he so elected, or made default, it was decreed that he should pay for them; on his refusal to retain them, the defendant was allowed to remove them in a reasonable time.

But in the case of *Stanbrough* v. *Wilson* (13 id. 494), decided a year later than *Gibson* v. *Hutchins*, the defendant, who had purchased land at a probate sale, which was declared void, and which would probably place him in the category of a possessor in bad faith, was allowed compensation for his improvements, including over $4,000 for clearing the land, and judgment was given in his favor for a balance exceeding $5,000, over the rent of the property.

And in the case of *D'Armand* v. *Pullin* (16 id. 243), where the defendant had erected various improvements on land to which he had no just title, the court held that, under the code, the plaintiff had the right either to keep them, or to cause their removal or demolition; but also held, that by executing a lease to the defendant for a few months, after having procured an adjudication of his title, he had elected to keep the improvements, and must pay the defendant their cost.

The case of *Wilson* v. *Benjamin et al.* (26 id. 587) was decided at the same term with *D'Armand* v. *Pullin* (1861), and

the judgment was affirmed on a rehearing in 1874. In that case, the plaintiff, who had been a possessor in bad faith, sued for the value of his improvements; and it was held that his expenses in clearing the land should be set off in compensation for his detention thereof; and judgment was given in his favor for the value of his other improvements, consisting of erections on the land; and the court refused to charge him any rent therefor, because they were his own property.

On the whole, we should infer the prevailing doctrine of the Supreme Court of Louisiana at present to be, that for inseparable improvements on land, such as clearings, &c., made by a possessor in bad faith, he cannot recover any compensation from the owner; though he will not be accountable for the fruits derived from such improvements.

But, as before suggested, we do not think that the decisions referred to govern the present case. It is so different in its circumstances from the cases in which those decisions were made, that any attempt to carry out the spirit of the code will require that those circumstances should be taken into consideration.

The character of the property, — a railroad, — so different from that of land; the character of the ameliorations made to it, partaking so nearly of that of necessary repairs; the acts and demands of the parties in this suit, wherein the plaintiffs seek possession of the ameliorations in question, and thereby in effect elect to retain them, and seek to charge the defendants for all the fruits and profits thereof; the fact that, at the instance of the complainants, and for their benefit, the property, with all its ameliorations, has been taken out of the defendants' hands, and placed in the hands of a receiver; the fact that the plaintiffs, in getting possession of the property, cannot but come into the enjoyment of large expenditures which the defendants have made, and which, if they had not made, the plaintiffs, or the persons who may purchase the property, would have to make, and which they are now relieved from making; the fact, in other words, that the taking of the property in its present state would make the complainants so much richer as the improvements are worth, — all these things combined present a case so peculiar, that we do not see how it is possible for the

complainants, under any fair interpretation of the code, to avoid allowing the defendants the value of the improvements. On the contrary, we think that the code, interpreted according to its spirit and meaning, requires that the complainants should take the property, or rather that it should be sold, subject to the lien of the defendants for the actual expense which they have incurred in creating and putting into repair the works as they now exist, but not to exceed the actual value thereof.

We have not thought it necessary to discuss or review the commentaries on the French code cited by both parties, except in a single instance, which will be presently stated. We have examined them sufficiently to ascertain that they give us no clear light on the precise question in this case. They are not consentaneous even on the general question of inseparable improvements made to land. The references to the Roman law, even if otherwise applicable to the case, cannot be received against the positive laws of France and Spain, much less against the text of the Civil Code of Louisiana. It is this code, and the proper meaning and effect to be given to its provisions, adopting its spirit where the letter is imperfect, that must decide the case before us. It is conceded by many French jurisconsults that the Roman law of Justinian refuses any reimbursement for improvements to a possessor in bad faith. But the French law has always been otherwise. See Denisart, *verbo* Ameliorations, vol. i. p. 495, where this subject is discussed.

Cujas thought the rule for reimbursement could be deduced from the general principle that no one ought to enrich himself by another's loss; and from the dispositions of the thirty-eighth law of the title De Petitione Hereditatis. Dig., lib. v. tit. iii. Pothier, expounding the old French law, says: " In our practice, it is left to the discretion of the judge to decide, according to the different circumstances, whether or not the owner ought to reimburse the possessor in bad faith for useful expenses to the amount that the property recovered is benefited thereby." And then he distinguishes between possessors in bad faith whose acts partake of a criminal character (such as usurping an estate without any title during the long absence of the owner), and those who have taken a title

which they knew was not valid, yet had some excuse for doing so (such as purchasing from a guardian, &c.). The former class should receive the utmost rigor of the law; the latter should be treated with indulgence, and should receive compensation for their ameliorations to the amount they have benefited the property. Pothier, Traité du Droit de Propriété, sect. 350.

The Code Napoleon settled many uncertainties of the old law, and attempted to lay down a fixed rule; but, nevertheless, as we have seen, left the question of inseparable improvements somewhat at large.

Demolombe, one of the ablest commentators on this code, in vol. ix. sect. 689, has a very interesting article on this subject. He thinks that inseparable improvements are not provided for by article 555 of the code; but that the question of compensation therefor is to be governed by general principles of equity, to be drawn from other sources. He instances the case of a possessor in bad faith who has drained a marsh, cleared lands, dug ditches for irrigation, or who has caused paintings to be made or paper to be placed on the walls of a mansion, or who has performed any other like work of intrinsic amelioration. And he asks, Is article 555 applicable in such a case? After stating the argument on both sides of this question, he gives his own opinion in the negative. He says the article refers to works which the possessor may be compelled to remove; but such as those mentioned are not susceptible of removal; and the option given to the owner, either to keep them by payment, or to cause them to be removed, cannot be exercised. Besides, it would be a savage doctrine to hold that the possessor might in any case destroy such improvements, even though he should leave the property in its first estate. He therefore concludes that the specific case is unprovided for, and thinks that it is necessary to resort to analogies deduced from similar matters and to the general principles of the law; and that a solution of the case may be found in the *quasi* contract of agency. We find here, he says, two rules of equity, both equally certain : —

*First*, That no one ought to enrich himself at the expense of another, — a rule which the law applies in the very case of

the relations between the owner and possessor, even in bad faith.

*Second*, That a third person cannot impose upon the owner of the soil, without his authority and against his will, expenses which he would not have made himself, and which exceed his means, and for the payment of which, if forced to it, he would have to sell an estate that he would prefer to keep.

In the combination and conciliation of these two rules, he thinks, we may find the solution of the difficulty.

He then quotes to his purpose a law of the Digest (law 38, De Rei Vindicatione, book vi. tit. i.), which he characterizes as full of good sense, equity, wisdom, and practical knowledge of affairs. It is a passage from Celsus, as follows : " On another's land which you have unwittingly bought, you have builded, or made repairs ; then you are evicted ; a good judge will decide according to *the merits of the parties, and according to the circumstances.* Suppose the owner would have done the same thing, then let him reimburse the expense, as a condition of receiving his land ; but only to the amount that it is benefited. If he is poor, and cannot pay without selling his home, you should be satisfied in being permitted to remove what you can of your improvements, leaving the estate in as good condition as if they had not been made. But it has been decided that if the owner can pay what the possessor can get for them, if removed, he should have that privilege. And let nothing be done in malice ; as, by defacing plaster or pictures on the walls, which could do you no good, but only result in injury. If it is the owner's intention immediately to sell the property, you will not be condemned to give it up, until he has paid what we have said he ought to pay."

Considering the possessor in bad faith as a *quasi*-agent in charge, and applying these principles, we must look, says Demolombe, —

*First,* To the *character of the possessor :* as whether he has taken a title which he knew to be invalid, but which he hoped to have confirmed ; or whether he was a mere interloper, without title, taking possession in the absence of the owner.

*Second*, To the *character of the owner :* as whether he would himself have been able and willing to make the improvements

in question; whether they would be useful to him, considering his profession, habits, &c.; and whether it was his intention to keep the property, or to offer it for sale.

*Third*, To the *nature of the improvements made:* as whether they have added to the income and to the actual value and salableness of the property, &c., or only to its ornamentation, &c.; also, whether the improvements have or have not been excessive and unreasonable.

The consideration of these three elements, giving due weight to each, will enable the judge to decide whether any indemnity should be given; what it should be; and how it should be paid, whether at once or on time, whether in a capital sum or in the way of rent.

This is the substance of Demolombe's article. We can only say, that if it is a sound explication of the law of France, and, therefore, of the law of Louisiana (which in this matter is exactly the same as that of France), it is in direct accord with the result to which we have been brought in this case, by the application of the principles which we suppose to be involved in article 508 of the Civil Code of Louisiana, interpreted according to its spirit and intent. If by the course of decisions in Louisiana it cannot be held to apply to the case of an ordinary immovable, it is at least applicable to such a case as that with which we are now dealing, considered in all its various circumstances.

The other points raised in the case do not present much difficulty. We shall proceed to consider those which we deem material.

*First*, The defendants complain that they were not allowed for the cost of those things which were consumed by them in the use, such as cross-ties, &c., which were worn out, and had to be replaced. The court below only allowed them compensation for those things which were in existence when the railroad was turned over to the receiver, in April, 1875. This, it seems to us, is in strict accordance with the law. In ordinary cases of possessors in bad faith, the owner, according to article 508, has an election either to keep the constructions and works, or to require their removal. He certainly cannot keep, nor require the removal of, that which no longer exists.

When he elects to keep them, as we suppose to be virtually the case here, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship. This evidently refers only to the materials which compose the things which are in existence at the time of making the election, — and that time, in this case, must be deemed to be the time of the delivery of the property to the receiver, which was on the 13th of April, 1875. We think the court was right in deciding that it was the improvements then in existence, the value or cost of which was to be allowed to the defendants.

*Secondly,* The defendants complain that the full first cost of the improvements which were in existence was not credited to them in the decree: they contend that these improvements cost them at least forty per cent more than their value at the time they were appraised by the experts, besides the sum of $49,005, which the experts deducted for deterioration.

The experts appraised these improvements in the fall of 1875, and estimated their then cash value at the sum of $347,361.29. It was sufficiently shown that their original cost was considerably more than this. The master, from the evidence before him, estimated and reported that the cost of materials and workmanship was, on the whole, twenty-five per cent more than their then value, the cost being much greater when the improvements were made than the same would be at the time of the appraisement, in consequence of the condition of the country after the war, the disturbance in labor, and the expansion of the currency. He therefore reported the cost at $434,201.61. But as the experts had deducted $49,005 for deterioration of iron rails whilst used by defendants, this sum added would make the whole first cost $483,206.61. The court, in its opinion, considers the allowance of twenty-five per cent as excessive, because, whilst prices were higher when the improvements were made, so also the currency was depreciated; and the court was of opinion that fifteen per cent additional was sufficient. This would make the first cost of the improvements equal to $399,465.48. But the decree allows the sum of $488,109.54, which is more than forty per cent greater than the amount of the appraisement. No explanation of this discrepancy has been

made. It seems to be the result of some inadvertent error in making the computations.

But, in our judgment, there should be no allowance for increased cost. We have proceeded on the principle of carrying out the spirit and equity of the law, since it cannot be carried out in the letter. Now, the letter gives the owner the option of requiring the improvements to be removed. This option is a means in his hands of protecting himself if the original cost is greater than the improvements are worth. As he cannot actually exercise it in this case, it would violate the spirit of the law to allow the defendants a greater sum. We think, therefore, that the appraised value of $347,361.61 is all that can be allowed to the defendants.

*Thirdly;* As to the question of interest. On this subject there does not seem to have been any distinct adjudication by the Supreme Court of Louisiana. In all the cases which we have examined, the rents, or fruits, have been deducted from the cost of the improvements, or *vice versa*, and judgment given for the balance, without any calculation of interest on either side, except where the possessor, in exoneration of the estate, has paid money which was a lien thereon. The question of interest does not seem to have been debated. But the French jurisconsults, who have given special attention to this subject, agree that when the owner of the land compels the unlawful possessor to account for the fruits of his improvements, the latter is entitled to interest on their value, — on the principle that it would be unjust to charge him for the fruits of his own improvements without allowing him interest on their cost, provided it does not exceed the amount of such fruits, — not, indeed, as interest properly so called, but as an equivalent *pro tanto* to the fruits received, in the account to be rendered thereof. They all agree, however, in saying that interest cannot be allowed beyond the amount of such fruits, and that it cannot be brought into compensation with the fruits of the original property. Demolombe on the Code Napoleon, vol. ix. art. 679; Aubry & Rau, Droit Civ. Fr., vol. ii. sect. 204 *b*, p. 232 and note; Dalloz, vol. xxxviii. p. 273, tit. Propriété, art. 429.

In the present case, the fruits were, in fact, the results of

the improvements made. The property, when taken possession of by the defendants, was a ruin. They reconstructed it, and made it capable of producing what it did produce. According to the French rule, therefore, the defendants were entitled to interest on their expenditures in making the improvements in question, provided it did not exceed the fruits and profits with which they were charged. It is conceded that interest should only be charged at the rate of five per cent per annum. The master estimates four and a half years as the proper average time for allowing interest. In this we concur. The interest, therefore, on the whole first cost of the improvements, without deducting for deterioration, would be $108,721.48. This should be credited against the net earnings for which the defendants are held responsible, both being in the same currency. These net earnings were found to be $161,476.69; and deducting the said interest therefrom, the remainder is $52,755.21, which is to be deducted from the value of the improvements. Being so deducted, the balance is $294,606.08.

This sum, according to our view, was the amount due to the defendants at the time when they delivered the property to the receiver, and not the sum of $391,959.42, as stated in the decree of the Circuit Court; which should, therefore, be reversed, with directions to be corrected in respect to the amount, as now stated; which amount, with interest at the rate of five per cent per annum from the time of delivering the property to the receiver, should be first paid to the defendants out of the proceeds of the sale of the property, before any payment made to the bondholders. But as it may be difficult for the bondholders, or other persons purchasing the property, to raise at once the whole amount due to the defendants, the court below should direct the property to be sold subject to the lien of the defendants for said amount with interest as aforesaid, and should allow a reasonable time to the purchaser, not exceeding nine months from the day of sale, to pay the same; with a condition annexed to said sale, that if the amount due the defendants be not paid within the time so limited, a resale of the property shall be made for the purpose of satisfying said amount due the defendants, with interest as aforesaid and expenses. The court should also direct that, subject to said

lien, no bid be received for a less sum than will be sufficient as a fund to defray the costs, expenses, and charges arising in the cause since the former decree of this court; which costs, expenses, and charges, except the costs of the defendants for attorneys', counsel, and witness fees, should be paid from said fund. The amount of said fund should be fixed by the court, and should be paid to the special master making said sale before adjudicating the property as sold to any bidder.

In view of the dispositions thus to be made in the decree, the defendants will not be concerned or interested in the accounts and transactions of the receiver; but any net earnings of the railroad, or proceeds of property, which shall have come into his hands as such receiver, after paying his expenses and compensation, will go to the benefit of the bondholders; and any deficiency of moneys in his hands to pay said expenses and compensation should be paid out of the said fund required to be paid in cash as aforesaid.

As to the costs in the court below, incurred since the former decree of this court, the defendants should be decreed to pay their own attorneys', counsel, and witness fees; and the residue of the costs, expenses, and charges in the cause should be paid out of the proceeds of said sale from the fund before specified in that behalf.

We do not deem it necessary to discuss the remaining points which have been raised on either side. We have given them due attention, and do not regard them as presenting any valid objection to the residue of the decree.

The decree of the Circuit Court will be reversed, and the record remitted with directions to enter a decree in conformity with this opinion, each party to pay their own costs of this appeal; and it is

*So ordered.*


MR. JUSTICE FIELD dissenting.

I agree with the court that the decree should be reversed, but I do not agree with it in allowing the defendants compensation for expenditures and improvements upon the road whilst they were in control of it. This court has held, after elaborate consideration, that they were possessors in bad faith,

having obtained control of the road fraudulently. I know of no law and no principle öf justice-which would allow them any thing for expenditures upon property they wrongfully obtained and wrongfully withheld from the owners, who were constantly calling for its restitution. Why should the owners pay for expenditures they never ordered, or for the construction of works they never authorized? The defendants knew all the time the vice of their title ; they knew they were not possessors in good faith ; they concocted the scheme by which the fraudulent sale was made ; and this court has so adjudged.

In the courts that administer the common law the rights of the owner are paramount and exclusive. An occupant without title is not recognized as entitled to compensation for improvements. Heron, in his History of Jurisprudence, says : There is no case " decided in England, Ireland, or the United States, grounded upon common-law principles, declaring that an occupant of land, without a special contract, is entitled to payment for his improvements as against the true owners, when the latter had not been guilty of a fraud in concealing the title." p. 715.

And courts of chancery do not give to an occupant compensation for improvements, unless there are circumstances attending his possession which affect the conscience of the owner, and impose an obligation upon him to pay for them or to allow for their value against a demand for the use of the property. *Putnam* v. *Ritchie,* 6 Paige (N. Y.), 390 ; Story, Eq. Jur., sect. 799 ; *Mill* v. *Hill,* 3 H. L. Cas. 828 ; *Gibson* v. *D'Este,* 2 Y. & C. 542 ; *Mulhallen* v. *Marum,* 3 Dru. & W. 317. To a possessor whose title originates in fraud, or is attended with circumstances of circumvention and deception, no compensation for improvements is ever allowed. *Railroad Company* v. *Soutter et al.,* 13 Wall. 517 ; *Morrison* v. *Robinson,* 31 Pa. 456 ; *Van Horne* v. *Fonda,* 5 Johns. (N. Y.) Ch. 388, 416 ; *Russell* v. *Blake,* 2 Pick. (Mass.) 505 ; *McKim* v. *Moody,* 1 Rand. (Va.) 58 ; *Morris and Others* v. *Terrell,* 2 id. 6.

The learned counsel for the appellants who argued this case showed, I think, conclusively, by reference to numerous adjudications and approved text-writers, that the civil law as enforced in Europe and in Louisiana draws the same line of

demarcation between the possessor in good faith and the possessor in bad faith in allowing for improvements and expenditures on the property of another. Pothier, the great legal writer, referring to the rule that no man ought to enrich himself at the expense of another, upon which compensation for improvements is here claimed, says: " A *bona fide* possessor may properly oppose it against an owner, but it is not available to a *mala fide* possessor. The owner can reply to the latter that equity did not empower him to take possession of his land and to make thereon such changes as he desired and so put the owner to charges that were burdensome, and that he might not wish to bear, and which this possessor had no right to impose. If the latter suffers from the failure to reimburse him, he must blame himself, as being in fault, and no one can complain of consequences he has brought upon himself." Traité du Droit de Propriété, sect. 350.

The civil law as thus stated corresponds with what a great chancellor of England said of the interference of equity to allow one the value of improvements on another's property. " If a person," he said, " really entitled to the estate will encourage the possessor of it to expend his money in improvements, or if he will look on and suffer such expenditures, without apprising the party of his intention to dispute his title, and will afterwards endeavor to avail himself of such fraud, the jurisdiction of equity will attach in such a case. *But does it follow from thence that if a man has acquired an estate by a rank and abominable fraud, and shall afterwards expend his money in improving the estate*, that therefore he shall retain it in his hands against the lawful proprietor? If such a rule shall prevail, it will certainly justify a proposition which I once heard stated at the bar of the Court of Chancery, that a common equity of this country was to improve a man out of his estate."

I prefer in this case to stand by the ancient law, than to follow any new doctrines supposed to arise out of the character of railroad property. To me it seems that the peculiar character of that property requires the special application of the old law; for just in proportion to the value of this property is the temptation to get possession of it, and if plunderers can, when

compelled to restore it, be allowed for their expenditures and alleged improvements, there will be an added incentive to plunder.

I therefore dissent from so much of the decree of this court as allows for expenditures upon property the possession of which the defendants did not obtain in good faith.