**In re WESTERN BOND & MORTGAGE CO.**
**No. B–16722.**

District Court, D. Oregon.

Nov. 17, 1941.

Teiser & Keller, of Portland, Or., for Geo. M. McBride, trustee in bankruptcy of bankrupt.

McCamant, Thompson, King & Wood and Thomas G. Greene, Sr., all of Portland, Or., for Bank of California, National Ass'n.

JAMES ALGER FEE, District Judge.

The present controversy arises (1) on review of the Report of Referee on determination of order to be made for restitution of real property to trustee and (2) on motion for re-hearing of the question of whether summary jurisdiction to order turnover was properly exercised.

Petition for adjudication in involuntary bankruptcy of Western Bond & Mortgage Company[1] was filed November 25, 1931. The corporation was adjudged bankrupt September 24, 1934. An order issued July 16, 1936, upon a petition filed by the trustee in bankruptcy praying that the Bank of California, N. A.,[2] show cause why it should not turn over as an asset of Western a piece of real property known as the "Russell Ranch", record title of which was then and is now in the Bank, together with 20 Boundary County, Idaho, Drainage District No. 10 Bonds.

Hearings were held, and on February 12, 1937, the referee directed the Bank to turn over the property. Petition for review was filed, and on May 1, 1939, the court entered an order affirming the referee in all respects, except that the court directed a special reference to determine what order should be made for restitution, to the end that expenditures made on the real property by the Bank should be properly credited in so far as legally deductible.

The question of the power of the court to order turnover was thus completely settled on the original review by the affirmance of the original findings. The referee, on the second reference, took this position in a letter dated May 24, 1939. Nevertheless, the Bank attempted to introduce evidence at the hearing, July 26–28, 1939, relating to the ownership of the "Russell Ranch" and the mortgages there-

---

[1] Hereinafter called "Western".

[2] Hereinafter called the "Bank".

on. This was ruled out, but put in the record under the rule.

The two questions here arise in the following way: First, on August 25, 1941, the referee filed report on the form of the turnover order allowing certain credits and denying others to the Bank. Petition to review has been filed thereon. Second, on September 4, 1941, the Bank moved for a re-opening of the findings as to the ownership of the "Russell Ranch" and the mortgages thereon, based on the claim of newly discovered evidence. Both these matters are now to be determined. The court will consider the latter motion first, since there is a contention that jurisdiction to render a summary order to turn over did not exist.

Western at various times had wholly owned subsidiaries, the Russell Land & Livestock Company,[3] Keystone Finance Company[4] and Ochoco Farms Corporation.[5] E. E. Gallagher, D. G. Smith, B. O'Reilly and Louise M. Thibodeaux were all women and office employees of Western. Since the dramatis personae have been listed, the argument is now set forth. By use of these puppets the property was taken from Western and is now in possession of the Bank.

The referee found upon the first hearing that Keystone "was operated and manipulated" by Western "as its adjunct, subsidiary and agent and for the sole purpose of carrying out its designs and biddings and was a mere corporate shell and had not actual existence for its own purposes but existed solely as a mere agent and alter ego of" Western. The court affirmed this finding and the evidence supports it. A similar state of facts existed as to Ochoco, if, in truth, that simulacrum had any corporate existence at any time.

A review of the complicated facts indicates that Western owned the "Russell Ranch" but held title first in the name of Russell Company, from whence title was transferred at discretion of Western to Keystone, which, thereupon, mortgaged the land for more than its value to Western. Although the full amount of consideration for these mortgages was paid by Western to Keystone, this money disappeared from the Keystone account in a short time.

After the bankruptcy petition was filed against Western, E. F. O'Flynn, who had acquired control of Massachusetts, which in turn owned control of Western, agreed to protect the Bank upon a large amount of indebtedness of Western. Pursuant to this scheme Ochoco was launched. Although the articles of incorporation were duly issued by the state, no organization meetings were held nor did the directors take oath nor qualify. Apparently there was no election of officers. However, certain employees of Western assumed to carry forward a purchase of the "Russell Ranch" from Keystone, as officers of Ochoco. As a result of a transfer to it from Ochoco of certain valueless property, Western obtained its mortgages upon the "Russell Ranch" by substituting securities therefor with the trustee for its bondholders, and thereupon cancelled them. Massachusetts then took a mortgage in a lesser amount upon the "Russell Ranch" and transferred this to the Bank. All these papers were held in escrow until the title could be passed upon by the Bank's attorneys, and were then simultaneously recorded. Ochoco performed no other function and immediately went into default in payment of its fees and was later dissolved by the state. Subsequently, the adjudication of Western on the petition heretofore noticed was allowed.

It is contended that the court should set aside its previous order based upon the proposition that summary jurisdiction existed because of newly discovered evidence and that which was offered before the referee on second reference, (a) that the mortgages held by Western were paid in full, (b) that these mortgages were not in possession of Western at the time of bankruptcy but were deposited with a trustee for bondholders of Western under a trust agreement and, further, that this court misconstrued the law.

This evidence was rejected by the referee because he believed the order of reference foreclosed the raising of the question. In this he was correct.

The court, however, will give consideration to the evidence rejected and put in the record under the rule. At the outset, although there are no terms in bankruptcy, it should be noted that there are equitable considerations which affect the re-opening of determinations in bankruptcy. One of these is laches. The original order of turnover by the referee was issued on February

---

[3] Hereinafter called "Russell Company".

[4] Hereinafter called "Keystone".

[5] Hereinafter called "Ochoco".

12, 1937. The order of the court adopting these findings relating to ownership by the bankrupt was entered May 1, 1939. By letter of May 24, 1939, the referee indicated that these findings would be considered binding. In July, 1939, a hearing was had in which the offers of proof were made and rejected. On August 25, 1941, the referee filed the findings relating to the expenditures. The motion to re-open the former order relating to ownership of the assets was not filed until September 4, 1941.

If the order affirming the findings on the first reference did not relate to the jurisdiction of the court, the Bank is precluded from raising it now. The court, however, will consider the evidence rejected as if the issue involved raises the question whether the court had jurisdiction to summarily order the Bank to turn over the property.

The newly discovered evidence, which it is claimed indicates that the mortgages were paid in full by Western, is unsatisfactory. Even if the money went into the account of a subsidiary, it is clear Western had full control of such accounts and withdrew from them at its pleasure. Besides, there is no showing that these amounts were paid in satisfaction of the mortgages. Western left the mortgages in the trust account after it is claimed they were paid.

But it is claimed that since these mortgages were thus upon deposit, they were not assets under control or in possession of Western at the date of filing of the petition. The "Russell Ranch" was overvalued for the purpose of placing these mortgages by Keystone to Western. This is an obvious device whereby assets are made to appear greater than they actually are. The entire value of the property at least was covered thereby. Whether the "Russell Ranch" be considered a piece of realty owned by Western or as a piece mortgaged by Keystone to Western for more than its value, it constituted the only available asset by which the Bank might recoup its previous losses on Western.

Ochoco on February 27, 1932 transferred to Western certain securities and properties which were in fact of no value or were already owned by Western. Thereafter, Western withdrew the mortgages upon the "Russell Ranch" and tendered them for cancellation. Ochoco and Keystone were instrumentalities of Western, and the fictitious nature of the entire transaction is obvious.

If the title to the mortgage on the "Russel Ranch" was not a valuable asset of Western's estate, it cannot be conceived why the Bank was so anxious to obtain it as security for debts of Western the Bank knew could never be paid. If the substance of this property did not belong to Western, it is inconceivable that the Bank would have gone to all the trouble of erecting sham corporations to transfer to Western worthless property which it already owned to give savor of legality to the cancellation of the mortgages. The evidence, if received, would indicate that Western at the time of the filing of the petition owned a valuable asset which it could obtain by withdrawal from the trust, that it did withdraw it and that without any consideration of value, the title to the asset is now in the Bank. This was the finding of the referee on the first reference which was confirmed by the court. The evidence tendered seems rather to strengthen than to weaken the foundation.

Possession of the bankrupt is established at the date of filing of the petition, if the property be found then in the hands of an agent or an entity which only had a colorable claim thereto.[7] This is particularly the case where a corporate entity can be described as an instrumentality of a parent corporation.[8]

In the decision entitled In re Eilers Music House, 9 Cir., 270 F. 915, 924, which arose in the Oregon district, a failing and insolvent corporation transferred to another corporation of interlocking directorate a large amount of property for no substantial value and itself operated the same for almost two years thereafter. Upon the filing of a petition in bankruptcy against the parent, it attempted to rely upon the corporate entity of the subsidiary. The court there held that the court of bankruptcy had jurisdiction in a summary proceeding to order the assets, which were thus a part of the general estate of the bankrupt, turned over to the trustee, notwithstanding that the subsidiary claimed it had an adverse right thereto.

The theory of the court here, however, does not involve any idea that the court should necessarily look through the corporate entity of Keystone or of Ochoco,

---

[7] Taubel-Scott-Kitzmiller Company, Inc., v. Fox et al., Trustees, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770.

[8] Fish v. East, 10 Cir., 114 F.2d 177, 191, where the rules relating to control are laid down and cases applicable to this theory cited.

although the latter, which was set up as a part of a scheme to defraud, became neither a de jure nor a de facto corporation and is the classic example of a situation where the court will disregard [9] an entity [10] if it exists.

Whether the court could look through the veil of corporate entity and hold that the property of the subsidiary could be administered upon that principle is a different question, but under these facts the rule might well be applicable, both as to Keystone and as to Ochoco.[11] The instrumentality theory, however, can be founded upon the language of the statute.

"The trustee of the estate of a bankrupt * * * shall * * * be vested by operation of law with the title of the bankrupt * * * to all * * * (4) property transferred by him in fraud of his creditors; (5) property, * * * which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him * * *".[12]

The question here, then, is how this particular real estate was held. The court held, heretofore, that although the record title was in the Keystone, actual title was in bankrupt. The sole question where an adjudication has been made is whether the bankrupt was in possession at the date of filing of the petition.[13] Property in the hands of an agent of a bankrupt at the time of filing of the petition[14] passes to the trustee after adjudication. If a bankrupt transfer property to a third person through a wholly controlled agent or instrumentality after filing of a petition, the trustee can recover in a summary proceeding. However, if such a transfer were made prior to the filing of the petition even if manifestly fraudulent,[15] an adverse rather than a summary proceeding would be required against the grantee.

"In consequence, any person acquiring an interest in property of the bankrupt or his assignees for the benefit of creditors, adverse to the creditors, after the filing of a petition with notice of it, may be directed to surrender the property thus acquired by summary order of the bankruptcy court." May v. Henderson, 268 U.S. 111, 117, 45 S.Ct. 456, 459, 69 L.Ed. 870.

On the other hand, if it be premised that bankrupt did not own the real property because of the existence of the separate entity of Keystone and the holding of the legal title by the latter, still an asset of the bankrupt has been removed from the estate. The bankrupt had a mortgage on this real property at the time of filing of the petition. That mortgage is no longer an asset of the bankrupt estate. It has been cancelled. As a result of the cancellation, the Bank has the legal title to the property. The bankrupt received no present consideration for the removal of this asset. But the Bank did attempt to cancel the indebtedness of the bankrupt as a consideration for the transfer from Keystone. If the bankrupt did not own the mortgage, this was an altruistic gesture by the Bank. The Bank, which obtained this asset by whatever devious process, should be required to return it. "Any other rule would leave the bankruptcy court powerless to deal in an effective way with those holding property for the bankrupt who, pending the bankruptcy proceedings, willfully dispose of it by placing it beyond the reach of the court." May v. Henderson, supra, 268 U.S. at page 118, 45 S.Ct. at page 459, 69 L.Ed. 870.

In summary, if Western owned the "Russell Ranch" and Keystone and Ochoco were its instrumentalities and agents, as the evidence shows, then Western had the asset in its possession and under its control at the date of filing the petition. If, on the other hand, it be conceived that Keystone and Ochoco were acting independently and without direction and control of Western, still the latter held mortgages for the full value of the realty which it abstracted from the trustee for the bondholders, and held in its possession after the filing of the petition and

---

[9] See Alder Slope Ditch Co. v. Moonshine Ditch Co., 90 Or. 385, 387, 176 P. 593.

[10] W. A. Liller Bldg. Co. v. Reynolds, 4 Cir., 247 F. 90, 91.

[11] Henry v. Dolley, 10 Cir., 99 F.2d 94.

[12] Title 11 U.S.C.A. § 110.

[13] White v. Barnard, 1 Cir., 29 F.2d 510.

[14] In re Cole, 1 Cir., 144 F. 392; In re Eddleman, D.C., 154 F. 160; In re Cantelo Mfg. Co., D.C., 201 F. 158; Davis v. Williams, 144 Ga. 637, 87 S.E. 1050; In re Goldberg & Sagman, D.C., 232 F. 194; In re Auto Safety Signal Lamp Co., D.C., 237 F. 299; In re Panamer Realty Corporation, D.C., 54 F.2d 656; In re Offricht, D.C., 260 F. 682; In re Independent Book Corporation, D.C., 33 F. Supp. 275.

[15] In re Mayer, D.C., 98 F. 839.

which it surrendered up for cancellation without consideration. In either event, a valuable asset was transferred to the Bank and taken away from Western and its creditors by the complicated devices heretofore outlined.

■ Summary jurisdiction of the bankruptcy court was thus founded.

The first question which will now be dealt with in inverse order is whether the report of the referee on the second reference as to credits to be allowed to the Bank upon the turnover order should be affirmed. The referee in the second reference, Honorable Estes Snedecor, filed an exceptionally able opinion in which the law of the state relating to real property was analyzed and applied to the facts of the case.

The findings of fact of the referee are confirmed in all respects relating to the conditions upon which the turnover is to be consummated. The conclusions relating to the sums required to be credited to the Bank or disallowed may be summarized as follows: (1) the annual rental value was fixed as of a time before the Bank took possession, (2) no credit was allowed for improvements, whether classified as permanent additions or as repairs, (3) credit was given for rental of pasture land accrued prior to possession of the Bank, but paid for by it, (4) credit was allowed for all taxes paid by the Bank, whether accrued before it took possession or afterward.

■ The turnover order required the surrender of the bonds heretofore mentioned, the "Russell Ranch" and a sum of money paid by the State of Oregon for a highway right of way. This is a correct order. The referee charged the Bank with annual rental after it took possession in the sum established as reasonable before the Bank took possession or made any repairs or improvements. This is correct as a basis, since the question of improvements should be considered separately. At least the Bank should pay reasonable rental for the land in unimproved condition.

The second question now arises. The referee refused to allow the Bank for either repairs and re-conditioning or for permanent improvements.

■ It must be kept in mind that all the dealings of the Bank with this property took place after the filing of the petition and notice of the fact to the Bank. Unquestionably, as appears from the subsequent letter of O'Flynn and other evidence, Western intended to give and the Bank intended to get an unreasonable advantage over other creditors. This constitutes an intent to "hinder, delay and defraud" other creditors, and a showing of actual fraud in the sense of gross and corrupt motive is not necessary to be shown.[16] Under the language of Title 11, U.S.C.A. § 110, sub. a(4), if the creditor obtained undue advantage because of the transfer,[17] it is fraudulent, although actual fraud be not shown, and the trustee is entitled to the property.[18]

■ The finding of the referee that the Bank did not purchase these lands in good faith must, in view of the authorities and the evidence, be affirmed. It was in good faith in trying to collect its indebtedness. It may be that everyone involved believed no adjudication would be entered and that an upturn of values would make the bankrupt solvent, but in each instance events have decreed otherwise.

The finding of fraudulent intent cuts into clear outline the positions with reference to money expended upon the property by the Bank. At common law the rule was extremely harsh.

The Supreme Court of the United States say as to that doctrine: "Was it ever known that a fraudulent purchaser of property, when deprived of its possession, could recover for his repairs or improvements, or for incumbrances lifted by him whilst in possession? If such a case can be found in the books, we have not been referred to it. Whatever a man does to benefit an estate, under such circumstances, he does in his own wrong. He cannot get relief by coming into a court of equity." Milwaukee & M. Railroad Company v. Soutter, 80 U.S. 517, 523, 13 Wall. 517, 20 L.Ed. 543.

■ It is true the harshnesses of this legal doctrine were softened when there were equitable circumstances to be dealt with in a court of equity. Even in proceedings in equity the courts have applied the common-law rule with some stringency.[19] The bank-

---

[16] See Mente & Co. v. Old River Co., D.C., 3 F.2d 38, affirmed 5 Cir., 17 F.2d 350.

[17] Hamilton Ridge Lumber Sales Corporation v. Wilson, 4 Cir., 25 F.2d 592.

[18] In re Webb Co., D.C., 224 F. 258.

[19] Burt v. C. Gotzian & Co., 8 Cir., 102 F. 937, 947; Blank v. Aronson, 8 Cir., 187 F. 241, 246, where in equity it was held that the grantee is not entitled to

ruptcy courts have applied the doctrine in much the same manner. One who has been compelled to surrender to the assignee any bankruptcy property purchased with knowledge that it was conveyed in fraud of creditors is not entitled to reimbursement for improvements or for money advanced to reduce incumbrances. In re Mead, D.C.1878, Fed.Cas.No.9,365. Where a bankrupt while insolvent organized a family corporation to which he transferred his property in an attempt to place it beyond the reach of creditors and the corporation borrowed money and paid off certain judgment liens on the property, the corporation occupies no better position with respect to the property than the bankrupt and would not be entitled to subrogation as to such liens.[20]

In Irving Trust Co. v. Finance Service Co., 2 Cir., 63 F.2d 694, 696, it is said: "The accepted federal rule is quite the contrary; even though the guilty grantee discharges liens against the property, or improves it, he may claim no credit in the account."

The court went on further to consider the rule applied in the state courts of New York where the case was brought. However, the suit there was by the trustee in bankruptcy to set aside fraudulent conveyances and was brought against an adverse claimant. The court, therefore, properly applied the law of the state in which the court was sitting,[21] although the court, influenced, perhaps, by the rationale of the federal decisions, did not allow the credit in the particular case.

The question whether the state law should be applied in a summary proceeding where the rule of decision comes from the statute itself is debatable.[22] However, it is assumed that the courts of the United States would in general attempt to make the incident of the re-transfer of real property conform as nearly as possible to the rule in the state,[22] whether this were strictly binding or not.

The rule in Oregon is laid down in the case of Schetter v. Southern Oregon Co., 19 Or. 192, 24 P. 25. There one Schetter purchased property from the manager of the Southern Oregon Company, of which he was a director and, as such, knew that the manager had no authority to sell the company's land. He transferred the real property to the Oddfellow's Lodge which placed improvements of great value upon it. The court held upon recision that Schetter was not entitled to reimbursement for the improvements, distinguishing the case of Hatcher v. Briggs, 6 Or. 31, where reimbursements had been allowed to an innocent purchaser. In the subsequent case of Bechtel v. Bechtel, 162 Or. 211, 219, 91 P.2d 529, 532, the court allowed recovery for expenditures for permanent improvements and for taxes and interest paid, but this ruling is expressly based upon the finding: "Undoubtedly he believed in good faith that he was the owner".

Here the referee found that the Bank was not in good faith in placing the improvements upon the land after the date of the referee's determination requiring a re-conveyance, and that in any event the conveyance was at least in constructive fraud of creditors. Under such circumstances the strictest holding would require a charge against the Bank of the profits made upon the land without any accounting or deductions for disbursements.[23] The referee did not apply this doctrine, but permitted a credit for taxes paid and for the rentals of the adjacent pasture lands required for operation of the ranch and which had accrued prior to the taking possession of the land by the Bank. Inasmuch as the Bank has not offered to account for the profits made upon the lands which could have been charged against it under the strictest rule, it is doubtful that such allowances can be justified to one who is seeking to take a bankrupt's property without regard to the rights of other creditors. Especially is this true where the Bank does not prove its profits which may well have offset the cost of repairs and permanent improvements and taxes.

The sole circumstance that presents any equitable consideration to the court in behalf of the Bank is the fact that apparently its officers and attorneys believed Western would weather the storm during the early part of the proceedings. The court believes it to be possible to justify the allowance of the prior pasture rental and delinquent taxes, as these expenditures were necessary to protect the estate. The allowance of taxes during operation by the Bank is more doubt-

---

payment for improvements, although he is charged with the rental value of the land while in his possession.

[20] In re Liller, D.C., 253 F. 845.

[21] Jackson v. Ludeling, 99 U.S. 513, 25 L.Ed. 460.

[22] Board of Commissioners of Jackson County, Kansas, v. United States, 308 U.S. 343, 350, 351, 352, 60 S.Ct. 285, 84 L.Ed. 313.

[23] See In re Medina Quarry Co., D.C., 179 F. 929, 933.

ful, but may be justified by the circumstance above mentioned and the state and federal decisions. No equitable considerations impel the court to an allowance of the expenditures for improvements or repairs in view of the situation of the Bank, and, especially, in view of its failure to account for profits.

The report of the referee is in all respects confirmed.

Order and decree may enter accordingly.